[No. S004440. Crim. No. 22530. Jan. 9, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM GEORGE BONIN, Defendant and Appellant.

810

814

COUNSEL

Frank O. Bell, Jr., under appointment by the Supreme Court, and Monica Knox, Chief Assistant Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael D. Wellington and Steven H. Ziegen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—This is an automatic appeal from a judgment of death (Pen. Code, § 1239, subd. (b)) imposed under the 1978 death penalty law (*id.,* § 190.1 et seq.).

In an information filed on January 2, 1981, defendant was charged with the murder of Donald Hyden, David Murillo, Robert Wirostek, Darin Lee Kendrick, Sean King, "John Doe," Marcus Grabs, Thomas Lundgren, Charles Miranda, James Macabe, Ronald Gatlin, Harry Todd Turner, Steven Wood, and Steven Wells. (Pen. Code, § 187.) He was also charged with robbing all of the above-named persons with the exception of Wirostek, King, and "John Doe" (*id.,* § 211); with sodomizing Grabs (*id.,* § 286, subds. (b)(1), (c)); and with committing mayhem on Lundgren (*id.,* § 203). The information contained numerous allegations. For example, as to each murder count a multiple-murder special circumstance was alleged (*id.,* § 190.2, subd. (a)(3)); as to each, with the exception of the counts involving Wirostek, King, and "John Doe," a felony-murder-robbery special circumstance was also alleged (*id.,* § 190.2, subd. (a)(17)(i)); and as to the count involving Grabs a felony-murder-sodomy special circumstance was alleged (*id.,* § 190.2, subd. (a)(17)(iv)). Defendant pleaded not guilty and denied the allegations. Subsequently, the counts charging the murder of Wirostek and "John Doe" were dismissed pursuant to Penal Code section 995.

On October 19, 1981, trial by jury commenced. Defendant was acquitted of murdering King and Lundgren, of sodomizing Grabs, and of committing mayhem on Lundgren, but was otherwise found guilty as charged. With the exception of the felony-murder-sodomy special-circumstance allegation, all the special circumstance allegations were found true. Defendant received the penalty of death for each of the 10 murder convictions.

As we shall explain, we conclude that except as to the "multiple" multiple-murder special-circumstance findings, the judgment must be affirmed in its entirety.

## I. THE FACTS

As a result of his activities in Southern California in the years 1979 and 1980, defendant—who was then in his early 30's—was dubbed the "Freeway Killer" and his murders the "freeway killings." After he was tried in this Los Angeles County proceeding, he was tried in Orange County action No. C-47500. There he was convicted of the first degree murder and robbery of Dennis Frank Fox, Glenn Barker, Russell Rugh, and Lawrence Sharp; as to each murder count a multiple-murder special-circumstance allegation was found true; and for each murder he received the penalty of death.

The evidence introduced at the guilt phase of this action—insofar as it concerns the crimes of which defendant was convicted—tells the following story.

On August 6, 1979, the nude body of 17-year-old Marcus Grabs was found in Malibu Canyon near Las Virgenes Canyon Road; except for the victim's backpack, no clothing or other identifying evidence was discovered at the scene. Grabs had been killed by multiple stab wounds on August 5. The body showed signs of beating about the face and elsewhere and exhibited ligature marks on one ankle as well as on the neck.

On August 27, 1979, the nude body of 15-year-old Donald Hyden was found in the area of Liberty Canyon near the Ventura Freeway; no clothing or other identifying evidence was discovered at the scene. Hyden had been killed by ligature strangulation about August 25 or 26. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on at least one ankle and wrist as well as on the neck, and revealed indications of sexual activity before death.

On September 12, 1979, the nude body of David Murillo was found alongside the Ventura Freeway near the Lemon Grove overpass; no clothing or other identifying evidence was discovered at the scene. Murillo had been killed by ligature strangulation about September 9 or 10. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on the wrists as well as on the neck, and revealed indications of sexual activity before death.

On February 3, 1980, the nude body of 15-year-old Charles Miranda was found in an alley in downtown Los Angeles; no clothing or other identifying evidence was discovered at the scene. Miranda had been killed by ligature strangulation the same day. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on at least one ankle and wrist

as well as on the neck, and revealed indications of sexual activity before death.

On February 6, 1980, the fully clothed body of 12-year-old James Macabe was found near Walnut Drive in Walnut in front of the Pomona Freeway; no identifying evidence other than the clothing was discovered at the scene. Macabe had been killed by ligature strangulation on February 3. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on at least one ankle and wrist as well as on the neck, and revealed indications of sexual activity before death.

On March 15, 1980, the nude body of 19-year-old Ronald Gatlin was found near Central Avenue in Duarte; no clothing or other identifying evidence was discovered at the scene. Gatlin had been killed by ligature strangulation on March 14 or 15. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on at least one ankle and wrist as well as on the neck, and revealed indications of sexual activity before death.

On March 25, 1980, the nude body of 14-year-old Harry Todd Turner was found in an alley in Los Angeles; no clothing or other identifying evidence was discovered at the scene. Turner had been killed by ligature strangulation sometime on or after March 20. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on the neck, and revealed indications of sexual activity before death.

On April 11, 1980, the nude body of 16-year-old Steven Wood was found in an alley in Long Beach near the Pacific Coast Highway; no clothing or other identifying evidence was discovered at the scene. Wood had been killed by ligature strangulation on April 10 or 11. The body showed signs of beating about the face and elsewhere and exhibited ligature marks on at least one ankle and wrist as well as on the neck.

On April 30, 1980, the nude body of 19-year-old Darin Lee Kendrick was found on Avalon Street in Carson near the Artesia Freeway; no clothing or other identifying evidence was discovered at the scene. Kendrick had been killed by ligature strangulation and a stab wound to the upper cervical spinal cord on April 29 or 30. The body showed signs of beating about the face and elsewhere and exhibited ligature marks on at least one ankle and wrist as well as on the neck.

On June 3, 1980, the nude body of 18-year-old Steven Wells was found behind a gasoline station in Huntington Beach; no clothing or other identifying evidence was discovered at the scene. Wells had been killed by ligature

strangulation on June 2. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on at least one ankle and wrist as well as on the neck, and revealed indications of sexual activity before death.

In order to establish that it was defendant who had perpetrated the killings, the prosecution called to the stand Gregory Miley and James Munro.

Miley, a sexual partner of defendant and about 19 years old at the time relevant here, testified that it was defendant who was responsible for the death of Miranda and Macabe. Specifically, he said that he was with defendant as defendant was driving a van he owned on the night of February 2, 1980; defendant picked up Miranda in Hollywood in the early morning hours of February 3, and consensually sodomized him in the back of the van; defendant whispered to Miley, "The kid's going to die," and then started to tie up the youth; defendant asked, "What does your dad want for you? How much do you think we can get for ransom? Maybe a couple thousand?" and Miranda responded, "I don't think that I can get that much"; defendant asked, "How much money do you have?" and Miranda replied, "About $6"; defendant told Miley to take the money, and he complied; Miley said, "Well, why don't you let the kid go?," and defendant answered, "No, man, he'll know the van and he'll know us"; with Miley's help defendant proceeded to beat Miranda and to strangle him with a shirt and to crush his neck with a jack handle; defendant and Miley dumped Miranda's nude body in an alley and disposed of his clothing in various locations.

After doing the deed, Miley continued, defendant said, "Well, I'm horny again. I need another one," Miley responded, "Oh, man, no way. I don't want to do it no more. I just want to go home," but defendant went ahead and eventually picked up Macabe in Huntington Beach in the early afternoon of the same day, February 3, 1980; not long afterwards, defendant and the boy engaged in consensual sexual activity in the van; the trio then drove on; again defendant and the boy engaged in consensual sexual activity; soon, however, defendant started to tie up Macabe; he asked, "What could you get for ransom?" and stated, "This is a kidnap"; the boy tried to fight back; with Miley's help defendant proceeded to beat Macabe and to strangle him with a shirt and to crush his neck with a jack handle; defendant and Miley dumped Macabe's fully clothed body onto the side of a road and took money from his wallet; defendant then threw the wallet out of the van's window.

Miley admitted that he had been arrested and charged with the first-degree murder of Miranda and Macabe. He also admitted that he had been

allowed to enter a plea of guilty to those charges with concurrent sentences of imprisonment for 25 years to life on the condition that he would testify truthfully against defendant.

Munro, who—like Miley—was a sexual partner of defendant and about 19 years old at the time relevant here, testified that it was defendant who was responsible for the death of Wells. Specifically, he said that he was with defendant as defendant was driving his van on June 2, 1980; defendant picked up Wells as he was hitchhiking and participated in mutual consensual oral copulation with him in the back of the van; the trio eventually arrived at defendant's home in Downey; there, defendant and Wells continued their sexual activity, and Munro joined in; soon defendant persuaded Wells to allow himself to be tied up; defendant took from Wells's wallet $10, which was all the money it contained, and also various items of identification; with Munro's help he then beat Wells and strangled him with a T-shirt, disposed of his clothing and other property, and eventually dumped his body behind a gasoline station; defendant told Munro that he was the "Freeway Killer," that Miley was one of his partners in crime, and that he had committed about 14 murders in the course of his activities.

Munro admitted that he had been arrested and charged with the first degree murder of Wells. He also admitted that he had been allowed to enter a plea of guilty to second degree murder with a sentence of 15 years to life imprisonment on the condition that he would testify truthfully against defendant.

The prosecution also introduced evidence of extrajudicial admissions by defendant linking him to the crimes charged. Among other witnesses it called David Lopez, a reporter for Los Angeles television station KNXT. Lopez testified that defendant admitted that it was he who had killed the 10 young men and boys named above as well as others. Scott Fraser and Ray Pendleton, acquaintances of defendant, each stated that defendant said that while driving his van he picked up Grabs and in the course of a sexual encounter killed the youth. Jailhouse informers testified to various admissions on the part of defendant. Other witnesses gave testimony to the effect that defendant said he would not leave witnesses to his criminal activity alive.

The prosecution presented expert testimony to the following effect: the bodies of Miranda, Wells, and Wood each bore a kind of triskelion-shaped fiber that was not common but was consistent with carpeting in defendant's van; the bodies of Gatlin, Grabs, and Macabe each revealed the presence of foreign hair that matched defendant's; the body of Gatlin bore a seminal

fluid stain that could have been made by defendant; and the van and defendant's home were stained in several places with human blood.

The defense generally tried to show that the prosecution had not carried its burden of proof beyond a reasonable doubt. Particularly, it attempted to discredit the witnesses who testified against defendant.

At the penalty phase the prosecution presented evidence in aggravation. Some of that evidence related to prior adjudicated felonies. Defendant committed sexual attacks in late 1968 and early 1969 against 12-year-old Lawrence B., 14-year-old William J., 17-year-old John T., and 18-year-old Jesus M. As a result of his activities, he was convicted of molesting and forcibly orally copulating Lawrence B., kidnapping and sodomizing William J., sodomizing John T., and forcibly orally copulating Jesus M., and was committed to Atascadero State Hospital as a mentally disordered sex offender amenable to treatment. In 1971 he was returned to court, declared unamenable to further treatment, and committed to prison. In 1974 he was released. In 1975 he committed a sexual attack on 14-year-old David M. Later that year he was convicted of forcibly orally copulating the boy and was sentenced to prison. In 1978 he was paroled. The prosecution also introduced evidence relating to the Orange County killings, attempting to prove that in late 1979 and early 1980 defendant killed, and committed other offenses against, Dennis Frank Fox, Glenn Barker, Russell Rugh, and Lawrence Sharp.

In mitigation the defense presented evidence to the following effect. Defendant's father caused the family serious problems as a result of drinking and gambling. At age 10 defendant was in trouble and was sent to a detention home; while there he was sexually molested. At age 12 he stole a truck and was put into custody. Later, he joined the armed forces, served in Vietnam, and was decorated. A psychologist opined that defendant could function in the structured setting of a prison—and only in such a setting—and that there he could be productive.

## II. GUILT ISSUES

Defendant raises a number of claims going to the question of guilt. None, as we shall explain, establishes reversible error.

### A. *Conflict of Interest on the Part of Defense Counsel*

Defendant contends that in violation of the rule established by the United States Supreme Court in *Wood* v. *Georgia* (1981) 450 U.S. 261 [67 L.Ed.2d 220, 101 S.Ct. 1097], the trial court failed to inquire into the possibility of a

conflict of interest burdening his counsel at trial or failed to adequately act in response to what its inquiry discovered.

1. *The Facts*

On August 8, 1980, charges in what was to become this action were filed against defendant. On August 11, Earl L. Hanson was appointed to represent him as an indigent pursuant to Penal Code section 987.

Trial was set for May 4, 1981. Over the prosecution's objection, the court vacated the date and ordered a continuance, in part to allow defense counsel Hanson further time for preparation.

Trial was rescheduled for August 3, 1981. Again over the prosecution's objection, the court vacated the date and ordered a continuance, in part to allow Hanson further time for preparation. Trial was set for September 14, 1981.

At a hearing held on September 3, 1981, defendant expressed his intention to move to substitute the law firm of Charvet & Stewart and its partners William T. Charvet and Tracy L. Stewart as retained counsel in the place of Hanson, and to request a continuance to allow new counsel time to prepare for trial. The prosecution, through Deputy District Attorney Sterling E. Norris, stated that it would oppose such a motion, claiming that substitution would delay the commencement of trial and thereby seriously prejudice the People's case, and that certain previous dealings between Charvet & Stewart and key prosecution witness James Munro threatened to burden the firm with a conflict of interest if it undertook to represent defendant. Prior to this hearing, defendant had never indicated on the record any dissatisfaction with Hanson or any ability or desire to retain other counsel.

On September 14, 1981, the date on which trial was scheduled to commence, defendant made a motion to substitute Charvet & Stewart in the place of Hanson. The prosecution opposed the request on the following grounds: "1) That said motion is not timely made. [¶] 2) That any such continuance would substantially prejudice the People's case. [¶] 3) That there is a conflict of interest with Mr. Charvet in that he has talked to Mr. Munro and has attempted to represent him in the past. Mr. Munro will be one of the key witnesses presented by the prosecution. [¶] 4) That any retainer agreement by Mr. Charvet may involve book rights, creating an additional conflict."

As to the timeliness of the motion and defendant's reasons for requesting substitution, the record of the hearing reveals the following. Hanson

assured the court, "of my own opinion Mr. Bonin has never tried to be dilatory." Charvet can be understood to have stated that defendant had begun substantive discussions with him concerning representation "about four or five months ago." Hanson admitted he "was never the attorney of choice of Mr. Bonin." The court then asked the following questions and defendant gave the following answers.

"THE COURT: Mr. Bonin, you have had no difficulty with Mr. Hanson insofar as his representation of you is concerned, it's just a matter of personal choice that you want Mr. Charvet as your attorney; is that correct?

"THE DEFENDANT: I'm sorry, could you repeat that, Your Honor?

"THE COURT: You just personally want Mr. Charvet as your attorney of record; is that right?

"THE DEFENDANT: Yes, I feel like I have a much better rapport with Mr. Charvet than I do with any other attorney, at this point.

"THE COURT: Insofar as your relationship with Mr. Hanson is concerned, that has been a good one during the time he has represented you; is that right?

"THE DEFENDANT: It has but I don't feel that it has been to the point where it should be. . . .

"THE COURT: In what regard?

"THE DEFENDANT: Well, there is certain things that we cannot—that I don't feel I can discuss about the case.

"THE COURT: With Mr. Hanson?

"THE DEFENDANT: That's correct.

"THE COURT: Why?

"THE DEFENDANT: Personal vibes.

"THE COURT: Any other difficulty you have with Mr. Hanson other than these personal vibes?

"THE DEFENDANT: No legal problems, no."

For his part, prosecutor Norris told the court that further delay—Charvet said he would need "at least a 120 day continuance"—would result in the erosion of the testimony of his witnesses and thereby seriously prejudice the People's case. Norris also asserted that defendant made the substitution motion for purpose of delay. Specifically, he stated that it was defendant's intent—expressed, he said, in a surreptitiously recorded telephone conversation that was played for the court but not transcribed—that "if the Court does not grant the continuance for Mr. Charvet he is going to go pro. per. and get a six months continuance and then get another lawyer during that period of time."

Concerning Munro and the conflict of interest that would allegedly arise if Charvet & Stewart undertook to represent defendant, the record shows that many factual issues were hotly disputed.

Charvet denied the existence of an attorney-client relationship or the communication of significant information. For example, he said: "But as far as conflict of interest, I have nothing that I can cross-examine Mr. Munro on, any facts contrary that is not in the public record, that he has ever given me as a private attorney." Further, in a declaration submitted in support of the substitution motion, he stated: "[I]t is my belief that at no time was there an attorney-client relationship between Charvet & Stewart and Mr. Monroe [*sic*] as we were never retained by Mr. Monroe [*sic*], were never court appointed on his behalf, nor, employed in any way to represent Mr. Monroe [*sic*]." He also declared: "[I]t is my belief that at no time has there been a conflict of interest which would prevent the requested substitution." In another declaration, Charvet's partner Stewart stated: "I do not recall [Munro] making any admissions, nor imparting any confidential information to either of us." Finally, at the September 3 hearing, Charvet asserted: "We did not discuss anything regarding the case."

By contrast, prosecutor Norris claimed that an attorney-client relationship did in fact exist between Charvet & Stewart and Munro and that significant information passed from Munro to the firm. Moreover, he offered to call, among others, Munro himself "[i]f there's any question that [Charvet]'s talked in detail with Mr. Munro about the case . . . ."

It was, however, plain that Munro had sought the assistance of Charvet and Stewart with a view to obtaining their professional services, and that he had spoken with them about the matter of representation and—at least to some extent—about the facts of the case. For example, in his declaration in support of the substitution motion, Charvet stated: "During one or two of our visits to other inmates/clients, our office conversed with Mr. Monroe [*sic*] for a short period regarding our possible substitution in as the

attorneys." In her declaration, Stewart stated: "[S]ometime in the latter part of 1980, our office was contacted by James Monroe [*sic*], requesting a meeting with WILLIAM T. CHARVET. Subsequently, William T. Charvet and I met with Monroe [*sic*] at the Los Angeles County Jail. He expressed a desire to have us substitute in as his counsel. We discussed this with him . . . ." At the hearing Charvet impliedly admitted that he and Stewart discussed the facts of the case with Munro—"He stated . . . that he was innocent"—but claimed the discussion was minimal.

Prosecutor Norris emphasized the practical danger posed by the issue of the possibility of a conflict of interest. At one point he stated: "This does now present another problem, a problem on appeal for the People if a conviction results in this case. [¶] I cannot believe that an appeal counsel would not immediately seize upon that in some fashion in that kind of conflict." At another point he said: "What is the first thing appellate counsel is going to seize on in this case if [Charvet & Stewart] is allowed to substitute in as counsel? And that is the conflict of interest. . . . [¶] I think there is that possibility. That would be the first point seized on in any type of appeal."

Finally, as to the alleged literary-rights fee agreement between defendant and Charvet & Stewart and the conflict inherent in such an arrangement, the record contains the following colloquy.

"THE COURT: [Mr. Charvet,] It's suggested that you might address the subject of what your arrangements are with the defendant insofar as any book rights are concerned.

"MR. CHARVET: I told Mr. Norris the first time I talked to him and I'll tell him now again, that absolutely, he can research all he wants to, he has absolutely no right to go into my fee arrangement with this client or any client I have ever had, or anything else and that is—in fact, the case that he cited [*People* v. *Corona* (1978) 80 Cal.App.3d 684 [145 Cal.Rptr. 894]] is on appeal and that's even a questionable case.

"I'm not making a statement one way or the other, but I would feel very confident from the U.S. Supreme Court stating the following: That if a person's only asset that he had in the whole world was a book right to get an attorney of his choice—let's use this hypothesis—as long as the defendant himself did not benefit in any other way and saved the state and the county, and everyone else the money and he had the attorney of his choice then I think that they would even allow that, and I think that's what's going to end up with in the *Corona* case he's talking about and I think that's what's going to come out of the appeal.

"Other than that, is there anything else the Court—

"THE COURT: Not at this point."

Prosecutor Norris attempted to raise the issue again. He stated: "I think the Court is at least entitled to ask defense counsel the very limited question, 'Are those book rights a part of your retainer?' And if the answer is in the affirmative then I think the *Corona* case is substantial authority, in conjunction with the other conflict of interest that we have with Mr. Charvet representing Mr. Bonin, and I think Your Honor is entitled to ask that question and demand an answer from Mr. Charvet in regard to that." The court, however, made no inquiry into the matter.

Thereupon, the court denied the motion for substitution. Because of scheduling problems and in recognition of defendant's expressed desire to seek review by petition for writ of mandate to the Court of Appeal, it continued commencement of trial to the following Monday, September 21, 1981. To support its ruling it gave the following reasons.

"I'm satisfied based upon what I have heard that to walk into court on the day of trial after fourteen months of preparation and then ask this Court for a further continuance, ninety or 120 days or beyond that is an unreasonable disruption of the judicial process.

". . . I think not only does the defendant have a right to a speedy trial, the People have a right to a speedy trial, and by granting a further delay in this matter of any substantial nature is going to substantially hurt the People's case, and I make that finding.

"Secondly, Mr. Charvet, I'm deeply concerned with whatever contact you did have with the witness Munro who is going to be a witness in this case, and I think a conflict situation has, in fact, developed to the point that I don't see how the People can fairly call that witness to the witness stand and anticipate your cross-examination of a witness that you have talked to in the vein of possibly representing him, and there is that conflict.

". . . . . . . . . . . . . . . . .

"I want the record, also, if there's a possible writ on this matter, to be also clear I am deeply concerned with the fact that I think that this is a ploy by this defendant based upon what I've heard at this hearing, to delay this matter going to trial and I'm satisfied that if a continuance was granted through further efforts by this defendant that further delays would be sought and that the ends of justice would further be thwarted by his effort of

substituting an attorney or attempting to substitute an attorney fourteen months later on the date of trial."

After the court ruled on the matter of substitution, defendant made a motion to represent himself if Charvet & Stewart was not allowed to substitute into the case in the place of Hanson. The court asked, "Are you prepared to go to trial next Monday acting as your own lawyer?," and defendant answered, "I don't know. . . . I'd want to look over [the case] again and be able to answer that next Monday." Thereupon, the court stated as follows. "Well, we will withhold any ruling on your motion to act as your own attorney in this matter. [¶] Mr. Hanson will be your attorney of record. [¶] You confer with Mr. Charvet and Mr. Hanson and decide what appellate processes are going to be sought between now and next Monday. [¶] But if you decide not to seek any appellate review of this Court's ruling and that be your desire to act as your own attorney, we will take that up next Monday, but it will be with no further continuance if you want to come into this case and act as your own lawyer. We're going to go to trial on the date set. And it will not be a grant of pro. per. status to you predicated or based upon any lengthy continuance for trial preparation."

On September 18, 1981—as we may judicially notice (Evid. Code, §§ 452, subd. (d), 459, subds. (a), (c))—Charvet & Stewart submitted to the Court of Appeal a petition for writ of mandate on defendant's behalf seeking review of the court's ruling. In the accompanying memorandum of points and authorities it was stated that "There is no conflict of interest" involving Munro and that "a full disclosure and waiver were obtained by counsel from Bonin." In a form verification to the petition, defendant declared in relevant part: "I have read the foregoing Petition and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and, as to those matters, I believe it to be true." On that same day, the Court of Appeal summarily denied the petition.

On September 21, 1981, the date to which the commencement of trial had been continued, Charvet informed the court of the Court of Appeal's decision and stated that he intended to seek a hearing on the matter in this court. Defendant told the court that it was still his desire to proceed pro se if Charvet & Stewart was not allowed to substitute into the case in the place of Hanson.

In order to give Charvet an opportunity to file a petition for a hearing and to provide defendant with time to prepare to represent himself in the event substitution was not allowed, the court made the following order.

"All right. Here's what I'm going to do in this matter at this time: [¶] I'm going to order a continuance in this matter for approximately 30 days. [¶] Today is the 21st. I'm going to set the matter for Monday, the 19th of October, and on the 19th of October we're going to start the trial in this matter.

". . . . . . . . . . . . . . . . . . . . .

"We're going to start the trial in one of three possible ways.

". . . . . . . . . . . . . . . . . . . . .

"Mr. Charvet, if you desire to come into this matter and commence trial on the 19th of October, start jury selection, if that be Mr. Bonin's request and you are prepared to proceed to trial at that date, you will become the attorney of record. We will start the trial.

"If you indicate that you are not prepared to go to trial on that date and cannot be prepared to go to trial on that date, then we're going to go into plan B.

"Plan B is, Mr. Hanson, you will start the trial at that time in the event that Mr. Bonin wants you as the attorney of record.

"If he does not want you as the attorney of record, we're then going to plan C and we will go to trial on plan C, and that is, Mr. Bonin, you be prepared to act as your own lawyer. You will proceed to trial as your own attorney and, Mr. Hanson, you will be appointed as advisory counsel in the event that that does occur, and you will assist Mr. Bonin in taking this matter to trial on that date.

". . . . . . . . . . . . . . . . . . . . .

"But whether we go plan A, plan B, plan C, be here on that date, the 19th, prepared to proceed to trial."

After the court made its order, Charvet sought a clarification as to the issue of conflict of interest. "Your Honor, I now have a problem with plan A. [¶] There has been a ruling against me by Your Honor on three issues. Conflict of interest, delay tactics of the defendant. [¶] If, in fact, the conflict of interest is valid, if given the 30 days, let's assume hypothetically I am prepared to go to trial on October 19th, I still have the issue of conflict of interest if the Supreme Court has not ruled one way or the other. I have a problem."

The court failed to address the conflict issue at all, stating only: "Of course, plan A, B and C will all be nullified in the event the Supreme Court decides to stop it. [¶] All right. So we don't complicate this matter any further, . . . let's end the hearing at this time. [¶] October 19th is the date now set for trial."

As it turned out, Charvet & Stewart did not make an application in this court for a hearing on the Court of Appeal's denial of its petition for a writ of mandate.

On October 19, 1981, the date to which the commencement of trial had been continued, the court ordered the substitution of Charvet & Stewart as counsel for defendant in the place of Hanson. The relevant colloquy is as follows.

"THE COURT: All right. This case of People vs. William George Bonin, let's have the record reflect the appearance of the defendant in court, at this time represented by his attorney Mr. Earl Hanson, Mr. Norris representing the interest of the People. [¶] This matter is here, now, for trial. [¶] However, there is pending at this time a motion for substitution of attorneys. [¶] Mr. Hanson, do you want to be heard on the matter?

"MR. HANSON: Yes, if the Court please, Your Honor. [¶] Mr. Bill Charvet is present in court. At the request of Mr. Bonin, Mr. Charvet is here. [¶] It is Mr. Bonin's request that Mr. Charvet represent Mr. Bonin in his upcoming trial. [¶] It is, of course, with my consent, Your Honor, and my best wishes. [¶] I understand that Mr. Charvet agrees to accept the substitution and is prepared to commence the trial.

"THE COURT: Mr. Charvet; do you want to be heard?

"MR. CHARVET: Yes, Your Honor, that's correct.

"THE COURT: You are desirous at this time of becoming the attorney of record in this matter?

"MR. CHARVET: That's correct.

"THE COURT: And that's with the understanding that if I permit you to become the attorney of record in the matter we'll start the jury selection today; is that correct?

"MR. CHARVET: That's affirmative.

"THE COURT: And you are prepared to proceed?

"MR. CHARVET: I am.

"THE COURT: Are the People ready?

"MR. NORRIS: People are ready, Your Honor.

"THE COURT: All right. [¶] Mr. Bonin, is that what you want at this time? You want me to substitute Earl Hanson out as your attorney of record and Mr. Charvet to become your attorney of record for all purposes in this trial; is that correct?

"THE DEFENDANT: Yes, it is.

"THE COURT: All right. I'll order the substitution. Mr. Charvet, you are now the attorney of record for Mr. Bonin. [¶] Mr. Hanson, you are excused from further services in this matter."

Called by the prosecution at trial, Munro testified that he and defendant killed Wells. In cross-examination that spanned several days, Charvet attempted to destroy Munro's credibility, suggesting that Munro killed Wells without defendant's help or support. He exposed myriad inconsistencies in Munro's testimony at and before trial and in various statements he had made; compelled him to admit that he lied on numerous occasions; and forced him to concede that he testified against defendant solely to avoid the death penalty. In closing argument, Charvet exploited the record of the cross-examination to urge the jury to reject Munro's testimony out of hand as unworthy of belief.

2. *The Law*

 Under both the Sixth Amendment to the United States Constitution as applied to the states through the due process clause of the Fourteenth Amendment (e.g., *Powell* v. *Alabama* (1932) 287 U.S. 45, 68-71 [77 L.Ed. 158, 170-172, 53 S.Ct. 55, 84 A.L.R. 527]; see, e.g., *Holloway* v. *Arkansas* (1978) 435 U.S. 475, 481-487 [55 L.Ed.2d 426, 432-436, 8 S.Ct. 1173]) and article I, section 15 of the California Constitution (e.g., *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839]; see, e.g., *People* v. *Chacon* (1968) 69 Cal.2d 765, 773-774 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454]), a defendant in a criminal case has a right to the assistance of counsel.

 The constitutional guaranty "entitles the defendant not to some bare assistance but rather to *effective* assistance." (*People* v. *Ledesma, supra,* 43

Cal.3d at p. 215, italics in original [discussing both federal and state constitutional rights]; accord, *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 612 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333] [discussing state constitutional right]; see, e.g., *Holloway* v. *Arkansas, supra,* 435 U.S. at p. 481 [55 L.Ed.2d at pp. 432-433]; *People* v. *Chacon, supra,* 69 Cal.2d at pp. 773-774 [discussing both federal and state constitutional rights].)

Included in the right to the effective assistance of counsel is "a correlative right to representation that is free from conflicts of interest." (*Wood* v. *Georgia, supra,* 450 U.S. at p. 271 [67 L.Ed.2d at p. 230]; accord, *Leversen* v. *Superior Court* (1983) 34 Cal.3d 530, 536-537 [194 Cal.Rptr. 448, 668 P.2d 755] [discussing federal constitutional right]; *People* v. *Chacon, supra,* 69 Cal.2d at p. 774 [discussing both federal and state constitutional rights]; see *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 345-350 [64 L.Ed.2d 333, 344-348, 100 S.Ct. 1708]; *Holloway* v. *Arkansas, supra,* 435 U.S. at p. 481 [55 L.Ed.2d at pp. 432-433]; *Glasser* v. *United States* (1942) 315 U.S. 60, 70 [86 L.Ed. 680, 699, 62 S.Ct. 457].)

■ The right to the assistance of counsel "was designed to assure fairness in the adversary criminal process. . . . [In other words,] the purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial,' [citation] . . . . [I]n evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.' [Citation.] Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." (*Wheat* v. *United States* (1988) 486 U.S. 153, __-__ [100 L.Ed.2d 140, 148, 108 S.Ct. 1692, 1696-1697].)

■ Further, the constitutional guaranty protects the defendant who retains his own counsel to the same degree and in the same manner as it protects the defendant for whom counsel is appointed, and recognizes no distinction between the two. (*Cuyler* v. *Sullivan, supra,* 446 U.S. at pp. 344-345 [64 L.Ed.2d at p. 344].)

■ Finally, this right is "fundamental" (*Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 343 [64 L.Ed.2d at p. 343]) and "is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'" (*Holloway* v. *Arkansas, supra,* 435 U.S. at p. 489 [55 L.Ed.2d at p. 437], quoting *Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; accord, *Cuyler* v.

*Sullivan, supra,* at p. 349 [64 L.Ed.2d at p. 347]; *Rose* v. *Clark* (1986) 478 U.S. 570, 577-578 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101].)

 Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests. (See generally ABA, Model Rules Prof. Conduct (1983) rule 1.7 and com. thereto [hereinafter ABA, Model Rules].)

Conflicts spring into existence in various factual settings. For example, conflicts may arise in circumstances in which one attorney represents more than one defendant in the same proceeding. (See, e.g., *Holloway* v. *Arkansas, supra,* 435 U.S. at pp. 481-491 [55 L.Ed.2d at pp. 432-438]; *People* v. *Mroczko* (1983) 35 Cal.3d 86, 103-109 [197 Cal.Rptr. 52, 672 P.2d 835].) In such cases there is at least the possibility that "the interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties" (*Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 356, fn. 3 [64 L.Ed.2d at pp. 351-352] (conc. & dis. opn. of Marshall, J.)) and thereby undermine his loyalty to, or efforts on behalf of, one or all. Such a conflict, it is plain, can result in the infringement, or even the denial, of the defendant's constitutional right to the effective assistance of counsel.

Conflicts may also arise in situations in which an attorney represents a defendant in a criminal matter and currently has or formerly had an attorney-client relationship with a person who is a witness in that matter. (See, e.g., *Leversen* v. *Superior Court, supra,* 34 Cal.3d at pp. 536-540; *United States* v. *Armedo-Sarmiento* (2d Cir. 1975) 524 F.2d 591, 592 (per curiam).)

Such a conflict springs from the attorney's duty to provide effective assistance to the defendant facing trial and his fiduciary obligations to the witness with whom he has or had a professional relationship. (*Leversen* v. *Superior Court, supra,* 34 Cal.3d at p. 538.) "An attorney is forbidden to use against a [present or] former client any confidential information . . . acquired during that client relationship. [Citations.] Moreover, the attorney has a duty to withdraw, or apply to a court for permission to withdraw, from representation that violates those obligations. [Citation.] So important is that duty that it has been enforced against a defendant's attorney at the instance of his former client (who was also a codefendant) even at the expense of depriving the defendant of his choice of counsel. [Citation.]" (*Ibid.*) In a word, a conflict based on the attorney's obligations to a criminal defendant and to a present or former client, "as well as conflicts arising out of simultaneous representation of codefendants, may impair a defendant's constitutional right to assistance of counsel." (*Ibid.*)

Conflicts may also arise in situations in which an attorney undertakes representation of a defendant in exchange for the literary rights to a portrayal or account based on information relating to the representation. (See, e.g., *Maxwell* v. *Superior Court, supra,* 30 Cal.3d at pp. 616-617; *Ray* v. *Rose* (6th Cir. 1976) 535 F.2d 966, 974; *United States* v. *Hearst* (N.D.Cal. 1978) 466 F.Supp. 1068, 1082-1083 [53 A.L.R.Fed. 110], affd. in part and vacated and remanded in part on other grounds (9th Cir. 1980) 638 F.2d 1190; *People* v. *Corona, supra,* 80 Cal.App.3d at p. 720; ABA, Model Rules, *supra,* rule 1.8(d) and com. thereto; ABA, Model Code Prof. Responsibility (1982) DR 5-104(B), EC 5-4; ABA, Standards for Criminal Justice, Stds. Relating to the Prosecution Function and the Defense Function (1971) The Defense Function, std. 3.4 and com. thereto [hereinafter ABA, Standards, The Defense Function].)

As the American Bar Association has stated: "A grave conflict of interest can arise out of an arrangement between a lawyer and an accused to give to the lawyer the right to publish books, plays, articles, interviews or pictures, or related literary rights concerning the case. . . . [I]t may place the lawyer under temptation to conduct the defense with an eye on the literary aspects and its dramatic potential. If such an arrangement or contract is part of the fee, in lieu of the fee, or a condition of accepting the employment, it is especially reprehensible." (ABA, Standards, The Defense Function, *supra,* com. to std. 3.4; see *Maxwell* v. *Superior Court, supra,* 30 Cal.3d at p. 616 [to similar effect].)

■ In order to safeguard a criminal defendant's constitutional right to the assistance of conflict-free counsel and thereby keep criminal proceedings untainted by conflicted representation, the United States Supreme Court has laid down certain essentially prophylactic rules in this area.

When the trial court knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, it is required to make inquiry into the matter. (*Wood* v. *Georgia, supra,* 450 U.S. at p. 272 [67 L.Ed.2d at p. 230]; see *Holloway* v. *Arkansas, supra,* 435 U.S. at p. 484 [55 L.Ed.2d at p. 434].) It is immaterial how the court learns, or is put on notice, of the possible conflict, or whether the issue is raised by the prosecution (see *Wood* v. *Georgia, supra,* at pp. 272-273 [67 L.Ed.2d at pp. 230-231]) or by the defense (see *Holloway* v. *Arkansas, supra,* at p. 484 [55 L.Ed.2d at p. 434]).

The trial court is obligated not merely to inquire but also to act in response to what its inquiry discovers. (See *Holloway* v. *Arkansas, supra,* 435 U.S. at p. 484 [55 L.Ed.2d at pp. 434-435].) In fulfilling its obligation, it may, of course, make arrangements for representation by conflict-free

counsel. (*Ibid.*) Conversely, it may decline to take any action at all if it determines that the risk of a conflict is too remote. (*Ibid.*) In discharging its duty, it must act "'. . . with a caution increasing in degree as the offenses dealt with increase in gravity.'" (*Glasser* v. *United States, supra,* 315 U.S. at p. 71 [86 L.Ed.2d at p. 699].)

■ After the trial court has fulfilled its obligation to inquire into the possibility of a conflict of interest and to act in response to what its inquiry discovers, the defendant may choose the course he wishes to take. If the court has found that a conflict of interest is at least possible, the defendant may, of course, decline or discharge conflicted counsel. But he may also choose not to do so: "a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests." (*Holloway* v. *Arkansas, supra,* 435 U.S. at p. 483, fn. 5 [55 L.Ed.2d at p. 433]; accord, *Glasser* v. *United States, supra,* 315 U.S. at p. 70 [86 L.Ed.2d at p. 700].)

■ To be valid, however, "waivers of constitutional rights must, of course, be 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences[,]' . . . [and] must be unambiguous and 'without strings.'" (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 110, quoting *Brady* v. *United States* (1970) 397 U.S. 742, 748 [25 L.Ed.2d 747, 756, 90 S.Ct. 1463], and *United States* v. *Dolan* (3d Cir. 1978) 570 F.2d 1177, 1181, fn. 7.)

■ Before it accepts a waiver offered by a defendant, the trial court need not undertake any "particular form of inquiry . . ., but, at a minimum, . . . must assure itself that (1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right." (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 110; see *Glasser* v. *United States, supra,* 315 U.S. at p. 71 [86 L.Ed.2d at pp. 699-700] [to similar effect].)

■ When in violation of its duty the trial court fails to inquire into the possibility of a conflict of interest or fails to adequately act in response to what its inquiry discovers, it commits error under *Wood* v. *Georgia, supra,* 450 U.S. 261. (*Id.* at p. 272 [67 L.Ed.2d at pp. 230-231].)

To obtain reversal for *Wood* error, the defendant need not demonstrate specific, outcome-determinative prejudice. (See *Brien* v. *United States* (1st Cir. 1982) 695 F.2d 10, 14-15.) But he must show that an actual conflict of interest existed and that that conflict adversely affected counsel's perfor-

mance. (See *Wood* v. *Georgia, supra,* 450 U.S. at pp. 272-274 [67 L.Ed.2d at pp. 230-232]; *Brien* v. *United States, supra,* at p. 15, fn. 10; cf. *Strickland* v. *Washington* (1984) 466 U.S. 668, 692 [80 L.Ed.2d 674, 696, 104 S.Ct. 2052] [holding that violation of a defendant's right to conflict-free counsel requires reversal only if the defendant shows actual conflict and adverse effect].)

3. *Discussion*

 We turn now to the case at bar. We believe that the trial court did not fail to satisfy the requirements of *Wood* with regard to the alleged literary-rights fee agreement between defendant and Charvet & Stewart. The court cannot be deemed to have known, or to have had reason to know, of the possibility of a conflict in this regard. In our view, a court can be held to have knowledge or notice of the possibility of a conflict only when, as in *Wood* itself (450 U.S. at p. 266 [67 L.Ed.2d at p. 227]), it is provided with *evidence* of the existence of a conflict situation—a circumstance not present here. Otherwise, it would effectively be burdened with undertaking an inquiry in virtually all cases since it can almost always conclude that a conflict is "possible" as a matter of speculation. Such a burden, however, would be intolerable.

We recognize that in this case it seems easy to conjecture the existence of a literary-rights fee agreement. Defendant was indigent at the time defense counsel Hanson was appointed and apparently remained so; the case had an extremely high profile; and when the court raised the issue of the existence of a literary-rights fee agreement, Charvet replied nonresponsively with an opinion that the United States Supreme Court would not declare such an arrangement unlawful per se. But although these matters might perhaps lay a basis for speculation, they simply do not amount to evidence sufficient to trigger the duty of inquiry.

 We believe, however, that the trial court did fail to discharge its duties under *Wood* with regard to the possibility of a conflict of interest burdening Charvet & Stewart arising from the firm's former attorney-client relationship with Munro.

We recognize that initially the court acted as it was required to: it inquired into the possibility of a conflict; it then determined in effect that an attorney-client relationship had existed between Charvet & Stewart and Munro and hence that the firm faced an at least potential conflict if it undertook to represent defendant; and it denied the substitution motion in part because of the threat of that conflict.

But the court then proceeded to nullify the effect of its action when on the first day of trial it ordered the substitution of Charvet & Stewart in the place of Hanson without making any attempt at all to obtain from defendant a waiver of his constitutional right to the assistance of conflict-free counsel.

The court's conduct in this regard is inexplicable. Prosecutor Norris had twice emphasized the practical danger posed by the conflict issue, arguing presciently that "That would be the first point seized upon in any type of appeal." For his part, Charvet had made it plain that the danger did indeed exist: "If, in fact, the conflict of interest is valid, . . . I still have the issue of conflict of interest if the Supreme Court has not ruled one way or the other. I have a problem." He also had made it plain that the danger could readily be avoided by a waiver on the part of defendant: "Now Mr. Bonin has waived all semblance of any type of conflict of interest. [¶] He'd be glad to do that now on the stand. He told me that. He told Mr. Hanson that. He'd be glad, at this point, to put him under oath, have him state it on the record, and that takes care of his problem as far as any type of reversal [on appeal] from Mr. Bonin's standpoint, if there was, in fact."

Accordingly, we are compelled to conclude that in acting as it did the trial court failed to act properly under the *Wood* rule—and plainly failed to act with the caution required in a capital proceeding (see *Glasser* v. *United States, supra,* 315 U.S. at p. 71 [86 L.Ed.2d at p. 699]).

Against our conclusion, the Attorney General makes several arguments. To begin with, he may be understood to argue that defendant made no objection to the possibility of conflicted representation at the trial level and accordingly may raise no complaint about the matter on appeal. Under the relevant precedents, however, a defendant who has not made an objection below is not prohibited from raising on review a claim of a *Wood* violation. Indeed, it appears that in *Wood* itself the defendants never objected at any stage of the proceedings. (See 450 U.S. at p. 282, fn. 8 [67 L.Ed.2d at pp. 236-237] (dis. opn. of White, J.).) Moreover, under the reasoning of the case law, a defendant who has failed to make an objection should not be barred from raising the claim. To our mind, so long as the trial court knew, or reasonably should have known, of the possibility of a conflict of interest, it is immaterial whether or not the defendant made any objection. Indeed, unless the court makes an inquiry and discovers an at least potential conflict, the defendant may have no substantial reason to object to the possibly conflicted representation.[1]

---

[1] In his concurring opinion in *Cuyler* v. *Sullivan, supra,* 446 U.S. 335, 351-353 [64 L.Ed.2d 333, 348-349], Justice Brennan presents analysis that seems to imply that a defendant may not raise a claim of a *Wood* violation when the court has (1) inquired into the possibility of a conflict of interest, (2) warned him of the risks of conflicted representation, and (3) ascer-

■ The Attorney General next argues that the prosecution must be deemed to have withdrawn its "conflict of interest" objection to the substitution of Charvet & Stewart in the place of Hanson. The record is otherwise, supporting at most an inference that the prosecution simply failed to press its objection. But in any event, whether or not the prosecution withdrew its objection is immaterial here: although on these facts the prosecution's objection triggered the court's duty to inquire into the possibility of a conflict, its withdrawal of an objection could not release the court from its obligation to complete the task imposed on it by law.

■ The Attorney General then argues that the trial court did not in fact fail to discharge its duties. In support, he maintains the court was not required to do anything more than it did. In light of the discussion presented above, however, the point must be rejected.

■ The Attorney General next argues that defendant must be deemed to have waived his constitutional right to the assistance of conflict-free counsel. To make his point he directs our attention to the following: defendant was present at the relevant hearings and heard the colloquy among the court and counsel about the dealings between Charvet & Stewart and Munro, including Charvet's opinion that no attorney-client relationship had existed between his firm and Munro; defendant said that he wanted to be represented by Charvet & Stewart; Charvet made the representation, quoted above, that defendant was willing to waive his constitutional right to the assistance of conflict-free counsel; finally, the memorandum of points and authorities accompanying Charvet & Stewart's petition for writ of mandate stated, "a full disclosure and waiver were obtained by counsel from Bonin," and defendant executed a form verification of the petition.

■ As a reviewing court, "We indulge every reasonable presumption against the waiver of unimpaired assistance of counsel." (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 110; accord, *Glasser* v. *United States, supra,* 315 U.S. at p. 70 [86 L.Ed.2d at p. 699].) ■ In this case, we find nothing that rebuts any such presumption.

First and foremost, defendant did not even purport to make a personal, on-the-record waiver of his constitutional right to the assistance of conflict-free counsel. This fact is established beyond dispute, and the Attorney General does and can make no claim to the contrary.

We recognize that defendant was present at the hearings. But what he may reasonably be held to know about the issue of the conflict of interest is

---

tained that he voluntarily and intelligently chose such representation. In this case we can find no such "waiver": the trial court plainly failed to satisfy Justice Brennan's second and third requirements.

hard to determine. He heard prosecutor Norris argue that Charvet & Stewart had an attorney-client relationship with Munro and as a result would be burdened with a conflict if it undertook to represent him at trial, and he heard Charvet argue to the contrary; he saw the court determine that there would indeed be a conflict, and he saw the court subsequently ignore that determination.

It is true that defendant stated that he wanted Charvet & Stewart to represent him at trial. His statement, however, is without significance here since it was not made in light of a constitutionally adequate, on-the-record advisement of the possible dangers and consequences of conflicted representation.

It is also true that Charvet declared that defendant would personally waive his constitutional right to the assistance of conflict-free counsel on the record. But the fact is that defendant did not even purport to make such a waiver.

Finally, we recognize that the memorandum of points and authorities accompanying the petition for writ of mandate stated, "a full disclosure and waiver were obtained by counsel from Bonin," and that defendant executed a form verification of the petition. Defendant's verification, however, cannot be deemed a waiver. On its very face, it is altogether too broad and conclusory, providing the court with none of the assurances the Constitution requires it to obtain before accepting a waiver. More important, it is lacking in relevant legal effect: it verifies the *petition* and not the memorandum of points and authorities in which the statement about disclosure and waiver appears.

Thus, even when we read the record as favorably as we can to support the Attorney General's argument, we are compelled to conclude that it shows no more than that defendant might have been willing to waive his constitutional right to the assistance of conflict-free counsel and that such a waiver might have been knowing and intelligent.

A showing of that sort, however, is simply not enough. As we stated above, "at a minimum, the trial court must assure itself that (1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right." (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 110.) Here, it is plain, the trial court did not even attempt to obtain such an assurance.

■ The Attorney General next argues in substance that defendant caused whatever error the trial court may have committed and accordingly may not be heard to raise any complaint. His argument is to the following effect: defendant's motions to substitute Charvet & Stewart in the place of Hanson and to proceed pro se if substitution was not allowed constituted attempts to delay trial and thereby prejudice the People's case; confronting such attempts, the court was compelled to act as it did; therefore, if any of its acts or omissions was improper, defendant was responsible for the error and hence should not be allowed to derive any benefit therefrom.

Why defendant made his motions is hard to determine to any degree of certainty. The record does indeed support an inference that defendant acted for the sole purpose of delaying trial and prejudicing the People's case. But the record also supports another inference—viz., that as he faced a trial at which his life would be at stake, defendant wanted to be represented by counsel in whom he had full confidence or by no counsel at all.

Whatever defendant's motives may have been, we simply cannot conclude that defendant can be held responsible for the error of which he now complains: he did not compel the trial court to act as it did. On or before the first day of trial, the court need only have attempted to obtain from defendant a waiver of his constitutional right to the assistance of conflict-free counsel. If it had been successful—as the record shows it likely would have been—it could properly have ordered substitution and then proceeded to commence trial with Charvet & Stewart as counsel of record for defendant. If it had not been successful, it could then have denied the substitution motion to "protect the record and defendant's right to effective assistance . . . ." (*Maxwell* v. *Superior Court, supra,* 30 Cal.3d at p. 620.) In that case, it could also have denied as untimely (*People* v. *Windham* (1977) 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187]) defendant's motion to proceed pro se unless he was willing to commence trial forthwith. In short, the court had more than adequate means to properly retain control of the proceedings and hence must shoulder responsibility for its error.

■ We turn now from the fact of *Wood* error to its consequences. As stated above, to obtain reversal the defendant is not required to demonstrate specific prejudice but must show an actual conflict of interest burdening defense counsel and an adverse effect on counsel's performance arising from that conflict.

Defendant argues that *Wood* error is subject to automatic reversal. We cannot agree. We recognize that in a footnote the *Wood* majority used language that may perhaps be read to support defendant's position: "JUSTICE WHITE'S dissent states that we have gone beyond the recent

decision in *Cuyler* v. *Sullivan,* 446 U.S. 335 (1980). Yet nothing in that case rules out the raising of a conflict-of-interest problem that is apparent in the record. Moreover, *Sullivan mandates* a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" (450 U.S. at p. 272, fn. 18 [67 L.Ed.2d at p. 231], italics in original.) ▇▇▇▇ In our view, the quoted language must be considered dictum and cannot be deemed an accurate statement of the law. This is because the words of the *Wood* majority are contradicted by their actions: in that case they did not reverse but merely vacated the judgment and remanded the cause for a hearing in the trial court on the question whether an actual conflict in fact existed. Faced with an inconsistency between what the high court says and what it does, we think that we must follow as binding authority the latter and not the former. (See *Brien* v. *United States, supra,* 695 F.2d at p. 15, fn. 10; see also *United States* v. *Winkle* (10th Cir. 1983) 722 F.2d 605, 611-612 [revealing a similar understanding of *Wood*].)

▇▇▇▇ Having considered the matter closely, we believe that reversal is not required on this record. We shall assume for argument's sake that defendant has shown an actual conflict of interest burdening Charvet & Stewart. But we conclude that he has not shown, and cannot show, any adverse effect on counsel's performance resulting from the alleged conflict. Our review of the record reveals that Charvet's attack on Munro's credibility was broad and deep. We cannot find or even conjecture any failing on Charvet's part that could be attributed to any information he or his partner Stewart could conceivably have received from Munro when they discussed the possibility of representation. Accordingly, we hold that the *Wood* error in this case does not warrant reversal.[2]

## B. *Ineffective Assistance of Counsel*

▇▇▇▇ Defendant contends that he was denied his constitutional right to the effective assistance of counsel. He does not challenge defense counsel's

---

[2]Nor—contrary to the position Justice Broussard takes in his concurring and dissenting opinion—is vacation required in this case. As the analysis above reveals, the record clearly permits meaningful appellate review of the crucial issue of adverse effect. Whether or not it permits such review of the issue of actual conflict is immaterial here. To establish his claim, defendant must show *both* actual conflict and adverse effect. This he cannot do: he cannot show adverse effect. Therefore, vacation and remand for a hearing on actual conflict would be empty.

Although we have concluded that the trial court was not required to inquire about the possibility of a conflict of interest arising from the alleged literary-rights fee agreement because it was provided with no evidence of a conflict situation, we believe that in the future trial courts should follow the safest course and make an inquiry whenever they have any reasonable suspicion of the possibility of a conflict: by acting thus, they will protect the rights of the criminal defendant to the fullest extent practical and thereby avoid the risk of unnecessary reversals on appeal.

actual performance at trial or the effect of that performance on the proceedings. Rather, he asserts that the assistance provided to him must be presumed to have been ineffective because counsel was given only 30 days to prepare for trial.

We recognize that in some cases ineffective assistance must be presumed "without inquiry into the actual conduct of the trial" because "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small" that the cost of litigating the issue is unjustified. (*United States* v. *Cronic* (1984) 466 U.S. 648, 659-660 [80 L.Ed.2d 657, 668, 104 S.Ct. 2039].) But we do not believe that this is such a case.

It is true that the charges defendant faced were multitudinous and of the utmost gravity. There was also much evidence of various sorts and many potential witnesses. Further, at the September 14, 1981, hearing Charvet stated he would require "at least a 120 day continuance," and Hanson said Charvet might need "ninety days or 120 days." Finally, when trial commenced on October 19, 1981, Charvet stated, "I'm not as comfortable with just one month [of preparation] as I would have been with two or three."

But it is also true that at the September 14, 1981, hearing Hanson—who had worked on the case since August 1980 and was ready for trial—offered to give Charvet help in his preparation. Further, at the September 21, 1981, hearing Hanson opined that with his help *defendant* would be able to proceed pro se on the scheduled trial date of October 19, 1981—and thereby implied that with his help Charvet would be able to proceed as counsel on that date. Moreover, Hanson did in fact give Charvet the help that he had promised. Finally, on the first day of trial Charvet—albeit "not as comfortable with just one month as I would have been with two or three"—did indeed answer ready.

Therefore, on this record we simply cannot presume that defense counsel's assistance was ineffective without inquiry into the actual conduct of the trial. Accordingly, we must reject defendant's point.

C. *Motion to Bar the Testimony of Munro and Miley*

Defendant contends that the court erred when it refused to bar Munro and Miley from testifying against him at trial. The facts relevant to this claim are as follows.

On December 17, 1980, a meeting was held at defendant's request and was recorded on audiotape. Those who attended included defendant, his then counsel Hanson, and prosecutor Norris. Defendant sought the meeting

to explore the possibility of negotiating a disposition to this case, and any other cases involving the "freeway killings," that would result in a sentence less than death. Before substantive discussions began, defendant sought a promise from Norris that the prosecution would not use anything he said in the course of the meeting for any purpose other than determining whether or not to participate in a settlement. Norris gave his promise. Hanson soon left the meeting. Thereupon substantive discussions began. In the course thereof, defendant made statements that incriminated Munro and Miley. The prosecution subsequently declined to enter into a negotiated disposition.

Pursuant to a discovery request and over the prosecution's objection, Munro's counsel and Miley's counsel each learned of defendant's statements. Apparently in part because of those statements, Munro and Miley each agreed to a bargain under which each would be allowed to enter a guilty plea on the condition that each would testify truthfully against defendant at trial. In the course of plea negotiations no reference was made to defendant or his statements.

Before the guilt phase opened, defendant moved to bar Munro and Miley from testifying against him at trial. He based his motion on a claim that the prosecution had obtained the agreement of each man to testify by using his statements in violation of its promise. Determining, inter alia, that the prosecution had committed no breach, the court denied the motion.

Defendant now contends that the court's ruling was error. In support, he argues that the prosecution breached its promise and thereby violated his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

█ At the threshold there is a question whether the claim is properly raised. It is, of course, the rule that to preserve a *Miranda* claim for appeal a defendant must make a *Miranda* objection below. (E.g., *In re Dennis M.* (1969) 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296].) In this case, defendant made no such objection. Therefore, to the extent the point is predicated on *Miranda,* it appears not to be properly raised.

█ For the sake of discussion, however, we shall assume that defendant's claim is preserved in its entirety. Having considered the matter closely, we are of the opinion that the point must be rejected on the merits. The record contains credible evidence that the prosecution did not *use* defendant's statements to obtain the agreement of Munro and Miley to testify against him at trial—i.e., it did not *exploit* those statements either directly

or indirectly toward that end. Moreover, the record contains no evidence to the contrary.

Defendant asserts that the prosecution knew or at least should have known that it would be required to produce the statements to Munro and Miley in discovery. He also asserts that the disclosure of the statements led to their decision to testify. But such facts do not negate the conclusion that the prosecution's conduct simply does not amount to an exploitation of defendant's statements.[3]

Thus, the prosecution did not use defendant's statements to obtain the agreement of Munro and Miley to testify against him at trial. Consequently, it cannot be held to have violated its promise. Hence, the court's denial of defendant's motion was not error.

### D. *Admission of Experimental Evidence*

Defendant contends that the court erred when it ruled admissible the testimony of a prosecution criminalist concerning an experiment conducted to determine whether the ligature marks on the neck of the body of Wells could have been made by a T-shirt as Munro had testified. As prosecutor Norris was about to elicit the testimony referred to above, defense counsel Charvet requested a hearing pursuant to Evidence Code section 402 outside the presence of the jury on the question whether the evidence was supported by an adequate foundation. The court asked Norris for an offer of proof. Norris responded that the criminalist would testify that he wrapped a T-shirt around a part of his body and concluded that the striations produced were similar to those found on the neck of Wells's body. Without asking the prosecution to produce any evidence on the matter and without giving any statement of reasons, the court denied the request for a hearing and effectively ruled the testimony admissible. On direct examination, the criminalist testified in conformity with the offer of proof, adding that he had wrapped the T-shirt around his upper arm. On cross-examination, he admitted that he had never read of such an experiment in the scientific literature and had never conducted it previously.

---

[3] Defendant also argues as follows: through the force of its promise—as prosecutor Norris himself admitted below—the prosecution was prohibited from presenting evidence of Sean King's body, which it had found by using his statements; therefore, through the force of its promise it was also prohibited from presenting the testimony of Munro and Miley. We agree that the prosecution was barred from introducing evidence of King's body: it had admittedly exploited defendant's statements to discover its location. But we cannot agree that it was barred from calling Munro and Miley as witnesses: as stated above, the record contains credible evidence that it had not exploited defendant's statements to obtain their agreement to testify, and contains no evidence to the contrary.

■ The law that governs the issue at bar is settled. "Experimental evidence has long been permitted in California trial courts . . . ." (*People v. Roehler* (1985) 167 Cal.App.3d 353, 385 [213 Cal.Rptr. 353], citing *People v. Carter* (1957) 48 Cal.2d 737 [312 P.2d 665], and *People v. Spencer* (1922) 58 Cal.App. 197 [208 P. 380].) But "Admissibility of experimental evidence depends upon proof of the following foundational items: (1) The experiment must be relevant [citations]; (2) the experiment must have been conducted under substantially similar conditions as those of the actual occurrence [citation]; and (3) the evidence of the experiment will not consume undue time, confuse the issues or mislead the jury [citation]. [¶] In the case of experimental evidence, the preliminary fact [citation] necessary to support its relevancy is that the experiment was conducted under the same or similar conditions as those existing when the [event in question] took place. The standard that must be met in determining whether the proponent of the experiment has met the burden of proof of establishing the preliminary fact essential to the admissibility of the experimental evidence is whether the conditions were substantially identical, not absolutely identical." (*Culpepper v. Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110]; accord, *People v. Roehler, supra,* 167 Cal.App.3d at pp. 385-386.) ■ Admissibility also depends on proof, "with some particularity," of "the qualifications of [the] individual[ ] testifying concerning [the] experimentation . . . ." (*People v. Roehler, supra,* at p. 385.)

■ The proponent of experimental evidence bears the burden of production and proof on the question whether such evidence rests on an adequate foundation. (See *People v. Roehler, supra,* 167 Cal.App.3d at p. 385 [speaking only of burden of proof]; *Culpepper v. Volkswagen of America, Inc., supra,* 33 Cal.App.3d at p. 521 [same]; see generally Evid. Code, § 403, subd. (a) [speaking of burden of production as well as burden of proof].)

■ After review, we agree with defendant that the court's ruling was error. The prosecution simply failed to carry its burden as to foundation. For example, it did not produce any evidence to show the experiment was conducted under conditions similar to those of the Wells strangulation. It is not self-evident that the criminalist's upper arm and Wells's neck were similar in relevant aspect. Nor is it self-evident that the criminalist applied pressure to his arm the way Munro said defendant exerted force to Wells's neck. Further, the prosecution did not produce any evidence to show the qualifications of the criminalist. Indeed, on cross-examination the criminalist essentially conceded that he was unqualified to conduct the "experiment."

We recognize that the court's ruling implies by operation of law a finding of all the necessary foundational facts. (Evid. Code, § 402, subd. (c).) The

record, however, does not support such a finding. Accordingly, we are compelled to set that finding aside and to hold that the ruling predicated on it was erroneous.

■ We do not believe, however, that the error was prejudicial—nor, to our surprise, does defendant claim otherwise. We are of the opinion that there is no reasonable probability that the erroneously admitted testimony had any marginal effect on the outcome (see *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]): the properly admitted evidence supporting guilt was strong, whereas the contrary evidence was weak; moreover, the erroneously admitted testimony was not substantial even with regard to the Wells killing, and therefore did not affect the balance of inculpatory and exculpatory evidence. Accordingly, we hold that the error does not require reversal.

### E. *Admission of Testimony by the Parents of the Victims*

■ Defendant contends that the court erred when it allowed the parents of the victims to testify. In support he argues that he offered to stipulate to the testimony the prosecution intended to elicit, and that such an offer rendered the testimony itself irrelevant and inadmissible.

At trial the prosecution called one or both parents of many of the victims. From each it elicited testimony on such matters as what his son looked like, how old he was at the time of death, whether he had any money in his possession at the time he disappeared, and where and when he was last seen alive. From many of the parents it sought identification of photographs of the victims in life and in death. The defense offered to stipulate to the identity of the victims and to the admissibility of the photographs. The prosecution, however, refused to accept the offer. In conducting its examination, however, it did not elicit testimony on the effect of the crimes on the victims' relatives and friends.

In its broad form defendant's claim must be rejected. Contrary to what defendant implies, the defense simply did not offer to stipulate to the parents' testimony in its entirety. Thus, there was no offer that could have rendered the whole of that testimony irrelevant.

But to the extent that it concerns the parents' testimony to establish the identity of the victims and the foundation for the photographs, the claim has merit. ■ In *People* v. *Hall* (1980) 28 Cal.3d 143, 152 [167 Cal.Rptr. 844, 616 P.2d 826], disapproved on another point in *People* v. *Valentine* (1986) 42 Cal.3d 170 [228 Cal.Rptr. 25, 720 P.2d 913], we held that "If a fact is not genuinely disputed, evidence offered to prove that fact

is irrelevant and inadmissible under Evidence Code sections 210 and 350 respectively." Through the offer of the defense, the facts covered by the proposed stipulation—the victim was a human being and was alive before the alleged criminal act was committed and dead afterwards—were removed from dispute. Therefore, the testimony elicited to prove such facts was irrelevant and inadmissible. As we also held in *Hall,* "if a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence . . . to prove that element to the jury." (28 Cal.3d at p. 152.) Thus, the court should have compelled the prosecution to accept the defense's offer and barred it from eliciting testimony on the facts covered by the proposed stipulation.

■■■■ Although the court erred by admitting the parents' testimony to establish the identity of the victims and the foundation for the photographs, we are of the opinion that the error was harmless. The prejudice threatened by an error such as that committed here is the inflaming of the jurors' hearts against the defendant. In our view, the improperly admitted testimony— which was not accompanied by any so-called "victim impact" evidence (see *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529])— had no potential to inflame the jurors and hence could not have exposed defendant to prejudice. Accordingly, we conclude that there is no reasonable probability that the erroneously admitted testimony had any marginal effect on the outcome.

F. *Failure to Give Instructions Sua Sponte On the Reliability of Informer Testimony*

■■■■ Defendant contends that the court erred by failing to instruct the jurors sua sponte that they should consider an informer's testimony to be inherently unreliable and should view such testimony with suspicion. We recently held to the contrary. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776].)

III. SPECIAL CIRCUMSTANCE ISSUES

A. *Felony-murder Special Circumstances*

1. *Failure to Instruct on Intent to Kill*

■■■■ Defendant contends that the felony-murder special-circumstance findings must be vacated because the court did not instruct that intent to kill was an element of that special circumstance. We do not agree.

As we held in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], "The court must instruct on intent to kill as an element of the felony-murder special circumstance when there is evidence from which the jury could find [citation] that the defendant was an aider and abetter rather than the actual killer." Here, all the evidence showed that defendant either actually killed the victims or was not involved in the crimes at all; there was no evidence that he was an aider and abetter. Accordingly, the court did not err in failing to instruct on intent.

2. *Sufficiency of the Evidence*

■ Defendant contends that the felony-murder special-circumstance findings must be vacated on the ground that they are not supported by sufficient evidence. ■ That special circumstance requires the trier of fact to find, inter alia, that the defendant committed the act resulting in death in order to advance an independent felonious purpose. (*People* v. *Weidert* (1985) 39 Cal.3d 836, 842 [218 Cal.Rptr. 57, 705 P.2d 380], following *People* v. *Green* (1980) 27 Cal.3d 1, 47-62 [164 Cal.Rptr. 1, 609 P.2d 468], which was decided under the 1977 death penalty law, former Pen. Code, §§ 190-190.6, Stats. 1977, ch. 316, §§ 4-14, pp. 1256-1262.) ■ In this case, defendant argues, the evidence was insufficient to support such a finding.

■ "In reviewing the sufficiency of evidence, the question we ask is ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [allegation] beyond a reasonable doubt." ' " (*People* v. *Guerra* (1985) 40 Cal.3d 377, 385 [220 Cal.Rptr. 374, 708 P.2d 1252], quoting *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting in turn *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics in original.)

■ Although we believe that the question is close, we are nevertheless of the opinion that a rational trier of fact could have found the independent-felonious-purpose element of each of the felony-murder special circumstances beyond a reasonable doubt. A rational trier could surely have found that defendant committed the acts resulting in the deaths of Macabe and Miranda, for example, in order to steal: there is evidence that he talked of attempting to obtain ransom for both. A rational trier could have inferred that in committing the acts resulting in the deaths of the other victims, which were strikingly similar to those resulting in the deaths of Macabe and Miranda, defendant acted with similar intent.

Defendant argues that the evidence was insufficient to support the findings as to Hyden and Turner because the record is devoid of any direct

evidence that either had any money on his person at the time of the crimes charged. We are not persuaded. The record appears to support an inference that each was carrying money at the relevant time. In any event, it is undisputed that the clothes of each were removed. Defendant asserts in substance that the perpetrator's sole object in taking the clothing must have been to facilitate or conceal the killings. The assertion, however, is without basis. Accordingly, we must reject it out of hand.

B. *Multiple-murder Special Circumstances*

1. *Failure to Instruct on Intent to Kill*

 Defendant contends that the multiple-murder special-circumstance findings must be vacated because the court did not instruct that intent to kill was an element of that special circumstance. Again we do not agree.

As we implied in *People* v. *Anderson, supra,* 43 Cal.3d at page 1150, the court must instruct on intent with regard to the multiple-murder special circumstance when there is evidence from which the jury could find that the defendant was an aider and abetter rather than the actual killer. As stated above, there was no evidence that defendant was an aider and abetter. Accordingly, the court did not err in failing to instruct on intent.

2. *"Multiple" Multiple-murder Special-circumstance Allegations*

 Defendant correctly contends it was error for the prosecution to allege more than one multiple-murder special circumstance. (*People* v. *Anderson, supra,* 43 Cal.3d at p. 1150.) It follows that nine of the ten multiple-murder special-circumstance findings must be vacated on this ground.

### IV. PENALTY ISSUES

Defendant raises a number of claims bearing on penalty. None, as we shall explain, establishes reversible error.

A. *Admission of Testimony by the Parents of the Victims at the Guilt Phase*

 Defendant contends that the testimony of the parents establishing the identity of the victims and the foundation for the photographs, which was erroneously admitted at the guilt phase (see part II E, *ante*), requires reversal of the judgment of death.

In support of his point, defendant argues at the threshold that the erroneously admitted testimony was before the jurors in their penalty phase deliberations. We agree. The court instructed the jurors that "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case."

Defendant then argues that the erroneously admitted testimony must be deemed prejudicial. We cannot agree. As we stated above, this testimony—which did not include any so-called "victim impact" evidence—had no potential to inflame a reasonable juror and hence could not have exposed defendant to prejudice. (See part II E, *ante*.)

### B. *Admission of Murders to Be Tried in the Orange County Action*

 Defendant contends that the court erred when it allowed the admission of evidence of the four murders for which he was to be tried in the Orange County action. Specifically, he argues that as a result of the ruling he was improperly compelled to surrender one constitutional right to assert another: to present a defense to the Orange County murders at the penalty phase here, he had to surrender his privilege against self-incrimination and thereby reveal at least in part the defense he would mount in the Orange County action; to preserve his privilege against self-incrimination and thereby shield his defense in the Orange County action from disclosure, he had to forgo his right to present a defense to the Orange County murders at the penalty phase here.

To the extent that defendant's point is based on the United States Constitution, it is without merit. The federal Constitution, in our view, does not forbid imposing on defendant the choice required by the trial court's evidentiary ruling. (Cf. *McGautha* v. *California* (1971) 402 U.S. 183, 208-220 [28 L.Ed.2d 711, 726-733, 91 S.Ct. 1454] [the federal Constitution does not prohibit the states from having guilt and punishment determined in a unitary capital trial, even though in such a trial the defendant is compelled to choose either to speak on guilt and thereby waive his privilege to remain silent on punishment or to speak on punishment and thereby waive his privilege to remain silent on guilt].)

To the extent that defendant's point is based on the California Constitution, it is also without merit. Defendant argues that our decision in *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789], supports his claim. It does not. In that case we held that pursuant to the state constitutional privilege against self-incrimination the trial court, on request, must grant a minor immunity from use at trial of any statement

he makes in a fitness hearing. (*Id.* at pp. 806-811.) Our holding was based on the premise that in the circumstances there the minor must be deemed to be subject to "a compulsive sanction against exercise of the self-incrimination privilege." (*Id.* at p. 812 (conc. opn. of Grodin, J.).) We cannot conclude that defendant was subject to such a "compulsive sanction" in the circumstances here.

### C. Claims Relating to CALJIC Nos. 8.84.1 and 8.84.2

Defendant makes a number of claims relating to the core penalty instructions delivered by the court. The court instructed the jury in accordance with former CALJIC No. 8.84.1 as modified and ultimately with section 190.3 of the Penal Code (hereinafter section 190.3).[4] The court also instructed in accordance with former CALJIC No. 8.84.2 as modified and ultimately with section 190.3.[5]

---

[4] The instruction was as follows. "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crimes of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal conduct.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects [*sic*] of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

[5] The instruction was in relevant part as follows. "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant.

". . . . . . . . . . . . . . . .

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating

### 1. *Failure to Delete Sentencing Factors Inapplicable on the Evidence*

■ Defendant contends that the court erred by instructing on all the statutory sentencing factors and by failing to delete such factors as were inapplicable on the facts of this case. We rejected a similar point in *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127]. For the same reasons, we reject this point here.

### 2. *Statutory Sentencing Factor (a) and "Multiple" Multiple-murder Special Circumstances*

■ Defendant contends that the court's instruction as to statutory sentencing factor (a) was prejudicial error because it effectively directed the jurors to consider 10 multiple-murder special-circumstance findings instead of 1. We agree that the instruction was erroneous: as we concluded above (see part III B 2, *ante*), there can be only one such finding in a proceeding. We cannot agree, however, that the error requires reversal. Having reviewed the record of the penalty phase in its entirety, we are of the opinion that there is no reasonable possibility that the error had any marginal effect on the balance of aggravating and mitigating evidence or on the consequent determination of the appropriateness of death: although we presume that the jurors considered the nine invalid special-circumstance findings independent of their underlying facts, we cannot conclude that they could reasonably have given them any significant independent weight. (See also *People* v. *Allen* (1986) 42 Cal.3d 1222, 1281-1283 [232 Cal.Rptr. 849, 729 P.2d 115] (lead opn. by Grodin, J.).)

### 3. *The Scope of Statutory Sentencing Factor (b)*

■ Defendant contends that the court's instruction as to statutory sentencing factor (b) was error. In support he argues that section 190.3 must be construed to limit the scope of that factor to crimes other than those of which the defendant was convicted in the capital proceeding. On this point we agree. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 105-106.) He then argues that the court's instruction did not so limit the scope of that factor. On this point, however, we disagree (see *id.* at p. 106) and so reject the claim of error.

### 4. *The Meaning of Statutory Sentencing Factor (i)*

■ Defendant contends in substance that contrary to what he asserts to be the legislative intent informing section 190.3, the language of factor (i)

circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

of the instruction on the sentencing factors may have misled the jurors to consider his "age . . . at the time of the crime" as a circumstance in aggravation. He misconstrues the legislative intent. In *People* v. *Lucky* (1988) 45 Cal.3d 259 [247 Cal.Rptr. 1, 753 P.2d 1052], we held that "the word 'age' in statutory sentencing factor (i) is used as a metonym for *any* age-related matter suggested by the evidence or common experience or morality that might reasonably inform the choice of penalty" (*id.* at p. 302, italics added) and hence may be considered in aggravation as well as in mitigation. Accordingly, we reject the point.

### 5. Easley "Factor (k)" Error

Defendant contends that the language of factor (k) of the court's instruction pursuant to former CALJIC No. 8.84.1 (hereinafter former factor (k)) may have misled the jurors to his prejudice about the scope of their sentencing discretion and responsibility under the Constitution, and may also have misled them about the evidence they might consider in exercising that discretion and responsibility.

In *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], we concluded at pages 877 and 878 that the language of former factor (k)—with its exclusive focus on "the crime" and not "the criminal"—might mislead jurors about the scope of their responsibility and about the evidence they might consider in exercising that responsibility. We observed at the same pages that in *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954], and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869], the United States Supreme Court held that the trier of fact may "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death" (*Lockett, supra,* at p. 604 [57 L.Ed.2d at p. 990], italics in original (plur. opn. by Burger, C.J.); accord, *Eddings, supra,* at p. 110 [71 L.Ed.2d at p. 8]).

After review, we cannot conclude that the potentially misleading language of former factor (k) was misleading in this case. In argument defense counsel Charvet told the jurors that they could and should consider such evidence and weigh it in mitigation of the penalty of death. Also, prosecutor Norris said to them, "Well, let me tell you, in terms of this penalty, you are to consider all the circumstances of his background." Indeed, in view of the foregoing, we believe that the jurors were led to consider the criminal as well as the crime and to weigh defendant's background and character evidence in mitigation. In conclusion, on this record we find no *Easley* "factor (k)" error.

### 6. *Failure to Instruct Sua Sponte on Sympathy*

 Defendant contends in substance that the court erred when it failed to instruct the jurors sua sponte that they could consider sympathy in choosing the appropriate penalty.

We believe that the court adequately instructed the jurors on this matter. (See part IV C 5, *ante.*) Defendant may be understood to claim that the court should have amplified on or explained its instruction. But in the absence of a request, it was under no obligation to do so. (*People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)

### 7. *Brown Error*

 Defendant contends that former CALJIC No. 8.84.2, incorporating the mandatory sentencing language of section 190.3, may have misled the jurors to his prejudice as to the scope of their sentencing responsibility and discretion in violation of the constitutional principles set forth in *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].

In *Brown* we held that section 190.3, as construed therein, was not unconstitutional. (40 Cal.3d at pp. 538-544.) In conformity with settled constitutional principles, we interpreted the statutory language to require jurors to make a moral assessment on the basis of the character of the individual defendant and the circumstances of the crime and thereby decide which penalty is appropriate in the particular case. (*Id.* at pp. 540-541.)

Although in *Brown* we upheld the constitutionality of section 190.3, we nevertheless recognized that when delivered in an instruction the provision's mandatory sentencing language might mislead jurors as to the scope of their sentencing discretion and responsibility. (40 Cal.3d at p. 544, fn. 17.) Specifically, a juror might reasonably understand that language to define the penalty determination as "simply a finding of facts" (*id.* at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale'" (*id.* at p. 541). A juror might also reasonably understand the language to require him to vote for death if he finds that the evidence in aggravation outweighs the evidence in mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544.)

We turn now to the case at bar. After review, we cannot conclude that the jurors may have been misled by former CALJIC No. 8.84.2. Neither

concern expressed in *Brown* was substantially implicated. For example, both prosecutor Norris and defense counsel Charvet called on the jurors to make their penalty determination as a moral assessment of defendant's personal culpability, Norris arguing for death and Charvet for life. Neither "counted" the sentencing factors or referred in any way to the mandatory sentencing language. Rather, we believe that the jurors were adequately informed as to what they were to do, and how they were to proceed, in the determination of penalty. In conclusion, on this record we find no *Brown* error.

8. *Failure to Instruct Sua Sponte on "Burden of Proof" in Determining Penalty*

▬ Defendant contends that the court erred when it failed to instruct the jurors sua sponte that they might return a verdict of death only if they were persuaded beyond a reasonable doubt that the evidence in aggravation outweighed the evidence in mitigation and that death was the appropriate penalty. In support he argues that the due process clause requires such an instruction. We rejected the substance of this claim, however, in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 778, footnote 15 [230 Cal.Rptr. 667, 726 P.2d 113].[6]

D. *Attack on the Constitutionality of the 1978 Death Penalty Law*

▬ Defendant contends that the 1978 death penalty law is unconstitutional. ▬ ▬ ▬ ▬ We rejected the substance of this claim in *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 777-779.[7]

## V. DISPOSITION

For the reasons stated above, we conclude that nine of the ten multiple-murder special-circumstance findings must be set aside on the ground that only one such special circumstance could properly have been alleged. We conclude that in all other respects the judgment must be affirmed.

---

[6] Defendant also asserts that the equal protection clause requires the instruction. But since he does not present adequate argument on the point, we reject the claim as not properly raised.

[7] In view of the theories presented and the evidence introduced, the jury's guilt phase verdicts imply findings that defendant actually killed, and intended to kill, the victims (*Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]). Having reviewed the record in its entirety, we conclude that these findings are amply supported by the evidence and adopt them as our own. Accordingly, the imposition of the penalty of death on defendant does not violate the Eighth Amendment. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689].)

It is so ordered.

Lucas, C. J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

BROUSSARD, J.—I concur in the reversal of eight of the nine multiple-murder special-circumstance findings. As to the affirmance of defendant's convictions, the remaining special circumstances and perforce the penalty, I dissent.

Defendant requested that his appointed attorney be replaced by retained counsel whom the trial court at one point found to be burdened with a conflict of interest by reason of counsel's prior contact with a key prosecution witness. (See maj. opn., *ante,* at p. 829.) In addition, there were clear indications that defendant's retainer agreement included a literary-rights clause in favor of counsel, placing squarely before the court the possibility of yet a second conflict of interest. Absent further inquiry by the court, and an express and effective waiver by defendant of his constitutional right to unconflicted counsel, the court had a duty to deny defendant's motion for substitution of counsel burdened with such conflicts of interest. (See *Wood* v. *Georgia* (1981) 450 U.S. 261, 271-274 [67 L.Ed.2d 220, 230-232, 101 S.Ct. 1097]; see also *Wheat* v. *United States* (1988) 486 U.S. 153, __ [100 L.Ed.2d 140, 149-152, 108 S.Ct. 1692].) No such waiver was obtained, and the court failed to fully explore the potential for conflict on either score; yet inexplicably it granted defendant's motion to substitute counsel and permitted the trial to proceed.

In pages of admirable scholarship, the majority set out the law applicable to a claim on appeal that defendant's counsel was burdened by an actual or potential conflict of interest. I have no quarrel with this learned exegesis. The majority go on to roundly defeat the People's multilayered claim that defendant waived the conflict. Again, I have no quarrel. Yet when we come to the application of the law to the facts, the majority stumble and fall. Under established principles of law (*Wood* v. *Georgia, supra,* 450 U.S. at pp. 272-274 [67 L.Ed.2d at pp. 230-232]; *United States* v. *Winkle* (10th Cir. 1983) 722 F.2d 605, 608-612; *Brien* v. *United States* (1st Cir. 1982) 695 F.2d 10, 14-15), defendant's convictions must be vacated and remanded to the trial court for a determination (1) whether a literary-rights agreement actually existed and (2) whether there was an actual conflict of interest arising from such agreement and from counsel's prior relationship with witness Munro adversely affecting counsel's performance such as to require reversal.

I am well aware of the pain and horror that this defendant has inflicted on so many. I too feel that his crimes are so shocking and heinous that it seems an outrage to question the lawfulness of the verdict in any way. Yet I am convinced that an impartial application of the law to the facts requires us to remand the matter to the trial court for an examination whether counsel operated under an actual conflict of interest which adversely affected his performance.

The majority find as to the possible existence of a literary-rights agreement that "[t]he court cannot be deemed to have known, or to have had reason to know, of the possibility of a conflict in this regard." (Maj. opn., *ante,* at p. 838.) They hold that "a court can be held to have knowledge or notice of the possibility of a conflict only when . . . it is provided with *evidence* of the existence of a conflict situation . . ." (*id.* at p. 838, italics in original, citing *Wood, supra,* 450 U.S. 261), and that no such "evidence" was present here.

It is difficult to understand what "evidence" the majority would require. The general rule has been that the duty of inquiry arises when the court "knows or reasonably should know" that a potential conflict exists. (See *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 347 [64 L.Ed.2d 333, 346, 100 S.Ct. 700]; see also *United States* v. *Burney* (10th Cir. 1985) 756 F.2d 787, 791; *United States* v. *Winkle, supra,* 722 F.2d at p. 611; *Brien* v. *United States, supra,* 695 F.2d at p. 15, fn. 10.) *Wood* itself established a duty to inquire into the potential for conflict when there is simply an "appearance" or "suggestion" of conflict. (*Wood, supra,* 450 U.S. at pp. 272, 273 [67 L.Ed.2d at pp. 230-231].) In *Wood,* the potential conflict was latent in the proceedings; the high court held that the trial court should have suspected a potential for conflict from defense counsel's strategy in the case.

The defendants in *Wood* were employees at a pair of retail pornography establishments. They were convicted of distributing lewd materials and given heavy fines, the payment of which formed a condition of their probation. When defendants failed to pay the fines, their probation was revoked. Defense counsel leveled a constitutional attack against the statute under which defendants were convicted, rather than pleading for leniency. The court knew that the defendants' lawyer, who had also represented them at trial, had been hired by their employer, and that the defendants had believed that their employer would also be paying their fines. The state's representative requested that the court inquire into the possibility of a conflict of interest arising from defense counsel's dual loyalties, but no such

inquiry was made. The United States Supreme Court held that "the possibility of a conflict of interest was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further" (450 U.S. at p. 272 [67 L.Ed.2d at pp. 230-231], italics & fn. omitted), and remanded the case "to determine whether the conflict of interest that this record strongly suggests actually existed. . . ." (*Id.* at p. 273 [67 L.Ed.2d at p. 231].)

The trial court in this case was on notice that an indigent defendant in a notorious case had retained counsel, who refused to deny the charge that the retainer included a literary-rights agreement. When the court tentatively questioned defendant's retained counsel about the existence of such an agreement, he gave answers which, while nonresponsive in the strict sense, were as clearly suggestive of the existence of a possible conflict as the facts before the court in *Wood*.[1] Yet the court inquired no further. To say that these facts merely "lay a basis for speculation" as to the existence of a literary-rights agreement (maj. opn., *ante,* at p. 838) is to dodge the clear implications of the *Wood* holding.[2]

A potential conflict of interest implicates more than just the defendant's interest in effective assistance of counsel. The Supreme Court has recently recognized that a trial court justifiably may refuse to accept a defendant's waiver of his attorney's potential conflict of interest, in order to vindicate the state's interest in just verdicts, in preserving the appearance of fairness, and in preventing unethical practices by attorneys. (*Wheat* v. *United States, supra,* 486 U.S. 153, __ [100 L.Ed.2d at pp. 149, 151].) The court recognized that potential conflicts may be difficult to evaluate in the murky light of pretrial hearings, but maintained that "a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflict warrants [different] counsel." (*Id.* at p. __ [100 L.Ed.2d at p. 149].) Under the circumstances of this case, the People's

---

[1] When questioned by the court about the existence of a literary-rights agreement between defendant and himself, counsel would neither confirm nor deny it. He argued in defense of such agreements, however, and stated that the prosecution "has absolutely no right to go into my fee arrangement . . . ." (See maj. opn., *ante,* at pp. 828-829.)

[2] It is true that unlike the trial court in *Wood, supra,* 450 U.S. 261, the court below did not know what arguments counsel planned to make on defendant's behalf and thus could not know whether counsel's manner of representation would in some way indicate the existence of an actual conflict. This is due simply to the timing of defendant's request to substitute counsel, however, and does not diminish the strength of the indications that such a conflict was *possible.* As the high court pointed out in *Wheat,* the court normally must examine a potential conflict of interest "in the murk[y] pre-trial context when relationships between parties are seen through a glass, darkly." (*Wheat, supra,* 486 U.S. at p. __ [100 L.Ed.2d at p. 151].)

charge that defense counsel's retainer was in part a literary-rights agreement was utterly plausible. The state's interest in the substance and appearance of justice, as well as its interest is preventing unethical practices by attorneys, required a full inquiry into the existence of such an agreement.

With respect to counsel's prior relationship with witness Munro, the majority concede that the trial court committed error under *Wood* (*supra,* 450 U.S. 261) by ordering the substitution of retained counsel in place of defendant's appointed counsel without any attempt to obtain a waiver from defendant of his constitutional right to conflict-free counsel.[3] The majority misinterpret *Wood,* however, to require that even when a trial court has failed to inquire fully into a potential conflict, unless defendant can show *from the record* that counsel's conflict of interest adversely affected counsel's performance, his convictions must stand. (Maj. opn. at p. 843.)[4] "[A]ssum[ing] for argument's sake" that counsel had an actual conflict of interest (maj. opn. at p. 843), the majority declare themselves unable to "find or even conjecture any failing on Charvet's part that could be attributed to any information he or his partner Stewart could conceivably have received from Munro when they discussed the possibility of representation." (*Id.* at p. 843.) The reason that the majority cannot fully determine whether there was in fact an actual conflict arising from counsel's representation of Munro is that although the trial court determined that counsel had a brief contact with Munro, it failed to inquire into and resolve the factual disputes raised by the district attorney and counsel regarding the extent to which this representation presented a potential for a conflict of interest affecting counsel's representation of defendant. In fact, the court seemed more concerned that counsel's contact with Munro presented some unfairness to the People, who intended to rely upon him as a central prosecution witness.

When the trial court fails to inquire into an apparent conflict of interest and fails to resolve the question whether there is an actual conflict, it leaves behind a record which is inadequate for a determination whether there was an actual conflict which adversely affected counsel's representation of the defendant. The lesson of *Wood* v. *Georgia, supra,* 450 U.S. 261, is that when such a defective record prevents meaningful appellate review, the reviewing court should vacate the judgment below and remand the matter to the trial

[3] Indeed, they defend the point vigorously and at length. (See maj. opn. at pp. 838-841.)
[4] The majority's discussion on this point is flawed by its failure to consider vacation and remand as an alternative to outright reversal. Such an omission is puzzling since this was the disposition in *Wood* itself, and was also central to the discussion of that case in *United States* v. *Winkle, supra,* 722 F.2d at pages 611-612 and *Brien* v. *United States, supra,* 695 F.2d 10, 15, footnote 10, cited by the majority.

court for a hearing to determine whether there was an actual conflict which adversely affected counsel's representation of the defendant. I would therefore vacate all counts and remand to the trial court to determine (1) whether there was a literary-rights agreement between defendant and his retained counsel, and (2) whether the conflict of interest resulting from such agreement, if it existed, and from counsel's prior relationship with witness Munro adversely affected counsel's performance.

Appellant's petition for a rehearing was denied March 2, 1989.