Filed 6/28/21  P. v. Thrower CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROBERT BEAR THROWER, JR.,<br><br>    Defendant and Appellant. | F075926<br><br>(Super. Ct. No. BF165348C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Timothy E. Warriner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Rachelle A. Newcomb, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Robert Bear Thrower, Jr., was convicted by jury of attempted murder. The jury also found true two firearm use allegations. On appeal, he contends (1) his right to conflict-free counsel was violated because he was represented by his codefendant's counsel at a pre-preliminary hearing where he made two self-incriminating statements; (2) the trial court abused its discretion when it refused to exclude his pre-preliminary hearing statements under Evidence Code section 352; (3) remand is necessary to allow the trial court to exercise its discretion to strike his firearm enhancements pursuant to Senate Bill No. 620; and (4) his four prior prison term enhancements should be stricken pursuant to Senate Bill No. 136. We order the prior prison term enhancements stricken and remand for the trial court to consider whether to strike the firearm enhancements. In all other respects, we affirm.

## PROCEDURAL SUMMARY

On October 17, 2016, the District Attorney of Kern County filed an information charging defendant with attempted murder of Don Lacey (Pen. Code §§ 664, 187, subd. (a);[1] count 1), attempted robbery of an inhabited dwelling while voluntarily acting in concert with two or more persons (§§ 664, 213, subd. (a)(1)(A); count 2), attempted second degree robbery (§§ 664, 212.5, subd. (c); count 3), and being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 4). As to count 1, the information further alleged that defendant acted with premeditation and deliberation (§ 189). As to counts 1, 2, and 3, it was alleged defendant intentionally and personally discharged a firearm in the commission of the crime (§ 12022.53, subd. (c)), and intentionally and personally discharged a firearm in the commission of the crime causing great bodily injury (§ 12022.53, subd. (d)). As to all counts, it was alleged defendant had served five prior prison terms (§ 667.5, subd. (b)). Defendant pled not guilty and denied all special

---

[1] All statutory references are to the Penal Code unless otherwise noted.

allegations. Before the jury began deliberating, the trial court dismissed counts 2 and 4 at the prosecution's request.

On May 11, 2017, a jury found defendant guilty of count 1 and not guilty of count 3. As to count 1, the jury found not true the premeditation and deliberation allegation, but found true both firearm allegations.[2] In a bifurcated proceeding, the trial court dismissed one prior prison term allegation at the prosecution's request and found true the remaining four prior prison term allegations.

On June 28, 2017, the trial court sentenced defendant to 13 years plus 25 years to life on count 1 as follows: the upper term of nine years, plus four one-year prior prison term enhancements (§ 667.5(b)), a 25-year-to-life firearm enhancement (§ 12022.53(d)), and a stayed 20-year firearm enhancement (§ 12022.53(c)).

## FACTUAL SUMMARY

On August 25, 2016, Don Lacey went to a hotel to purchase drugs. When he arrived, he exchanged a tablet for a "sack of methamphetamine." Afterwards, he approached Paul Morris. According to Morris, Lacey wanted to "kick it with a female and buy some dope." Morris pointed out a few girls, but Lacey changed his mind. Lacey was about to leave when he saw his neighbor's daughter, Shantel Taylor. Lacey asked Taylor if she wanted to get high. They then went into room 100. Within minutes, defendant, Morris, and Ronald Hartfield entered the room. Taylor was lying on the bed and Lacey was sitting on a chair.

Defendant asked Taylor what she was doing in the room. Taylor, who testified she was a prostitute, told defendant she was on a "date" with Lacey. According to Taylor, defendant was angry because she was pregnant and was not supposed to be using drugs or prostituting. Defendant checked her pockets for money. Lacey asked, "Should I

---

[2]     We note that the reporter's transcript reflects that the clerk read the verdicts in court as including a *true* finding on the premeditation and deliberation allegation (§ 189); however, the jury's written verdict clearly shows a *not true* finding, as does the clerk's minute order.

3.

exit the room and let you handle your business?" Defendant then turned his attention to Lacey and responded, "Don't talk to me. You don't know me. I say shit to you. Mind your business. Where you from? What you got in your pockets?" Lacey told him he did not have anything in his pockets, and he did not "gang bang." Defendant attempted to reach into Lacey's pockets, but Lacey slapped his hand away. Thereafter, defendant pulled out a revolver. After exchanging a few more words, Lacey got up and began walking toward the door and defendant shot him. Lacey suffered two gunshots to the upper body.

After the shooting, Lacey ran out of the room in search of help. As Hartfield was leaving the hotel, he saw Lacey outside clutching his chest. Hartfield told him that if he stayed there, he was going to die; Hartfield called 911 and left. Lacey was collapsed in the middle of the street by the time police and medical assistance arrived. Meanwhile, defendant went back to his room at the hotel, accompanied by Taylor and another female nicknamed Star.[3] Defendant's girlfriend, Jillian Hinzo, was asleep in his room when they walked in. Defendant handed Hinzo a gun and told her to get rid of it. She put it in her purse and stuck it in a bush near a street. Later that day, she and Star went back and retrieved the gun. They took it to Star's mother's house and then went back to the hotel where they spoke with an officer. The officer took them back to Star's mother's house to get the gun.

Officer Jesse Perez testified he recovered a black revolver from Star's mother's house. There were two spent rounds and two live rounds in it. He explained that in a revolver, the spent shell casings remain inside of it, whereas in a semiautomatic gun, they are ejected. Another officer testified that he did not locate any shell casings when they searched the room where the shooting occurred.

---

[3]    The record does not contain Star's true name. Therefore, we refer to her by her nickname.

Taylor, Morris, Hartfield, and defendant were all charged in connection with Lacey's shooting. However, at the preliminary hearing, the trial court dismissed all charges against Taylor at the prosecution's request. Morris and Hartfield entered plea agreements in exchange for their truthful testimony at defendant's trial.

Hartfield testified he saw defendant shoot Lacey twice with a black revolver. Morris testified he heard two gunshots but did not see the gun. He said defendant was the shooter. On the day of the shooting, Taylor told officers that defendant walked into room 100 with a black revolver and that he was the shooter. She said no one else in the room had a gun. Additionally, Hinzo testified that defendant asked her to get rid of a black revolver on the day of the shooting. She explained where she hid it and the circumstances leading to its recovery.

### Evidence of Defendant's Prior Statements at the Pre-preliminary Hearing

The prosecution introduced evidence that defendant had made prior incriminating statements. Deputy District Attorney Christine Antonios testified that she was assigned to defendant's case in September 2016, while Hartfield, Morris, and Taylor were still codefendants. On September 9, 2016, Antonios appeared at a pre-preliminary hearing where defendant was temporarily being represented by codefendant Taylor's counsel, Dana Kinnison, because defendant's counsel was not available. At this hearing, defendant made two statements before the court. First, he said his codefendants were innocent, and later, he admitted he was the shooter.

Hartfield also testified he heard defendant make the incriminating statements at the pre-preliminary hearing.

### Defense Evidence

The sole witness for the defense was Taylor's counsel, Kinnison. He described the events of the pre-preliminary hearing in which he stood in to represent defendant, and defendant made the incriminating statements.

5.

## I. Conflict-free Counsel

Defendant contends his right to conflict-free counsel was violated because codefendant Taylor's counsel, Kinnison, stood in for his counsel, Mark Raimondo, at the pre-preliminary hearing where defendant made two self-incriminating statements. He asserts that due to the conflict of interest caused by the joint representation, Kinnison made no attempt to prevent him from speaking at the pre-preliminary hearing, which resulted in defendant incriminating himself. We conclude, however, that even if Kinnison suffered from an actual conflict of interest, defendant was not prejudiced.

### A. Background

#### 1. Pre-preliminary Hearing

On September 9, 2016, defendant and his codefendants, Taylor, Morris, and Hartfield, appeared at a pre-preliminary hearing. According to Deputy District Attorney Antonios, the purpose of the hearing was to set new pre-preliminary and preliminary hearing dates. Defendant's counsel, Raimondo, appeared and had a brief discussion with the attorneys about new dates. Raimondo then asked Taylor's counsel, Kinnison, to stand in for him because he had to be in a different courtroom. The following exchange occurred at the hearing:

> "THE COURT: And then [defendant]. Good morning. [¶] [Defendant], for [the] purpose of today's hearing it's okay that Mr. Kinnison stands in for your attorney, Mr. Raimondo?
>
> "DEFENDANT []: Yes, sir. [¶] May I address the court?
>
> "THE COURT: Maybe.
>
> "DEFENDANT []: On one issue.
>
> "THE COURT: Go ahead.
>
> "DEFENDANT []: On behalf of Mr. Morris and Ms. Taylor and Mr. Hartfield, they are innocent, sir.

"THE COURT:  Okay.  Thank you."

The court then ruled on a motion to consolidate the cases, set new dates, and asked the defendants if they would waive time.  Neither defendant, nor any codefendant, agreed to waive time.  At the conclusion of the hearing, defendant stated, "I'm trying to take full responsibility for the case.  I'm the shooter."

## 2.     Motions in Limine

On April 27, 2017, defendant moved to exclude all statements he made during the pre-preliminary hearing.  After defendant learned that the prosecution wanted to introduce his pre-preliminary hearing statements, he filed another motion in limine to request that the court conduct an Evidence Code section 402 hearing to obtain a factual account of the pre-preliminary hearing.  In addressing defendant's request, the following exchange occurred:

"MR. RAIMONDO:  Sure.  As the transcript represents, on September the 9th,[ 2016,] I appeared on September the 9th, had a brief discussion about dates with other attorneys, and then I went on to another courtroom, leaving [defendant] to be represented for the brief continuance with Mr. Kinnison.  And then the transcript speaks for itself .…

"But off the record, and on the record, I don't believe [defendant] was adequately represented at that time at that critical juncture that led him to make those statements while he was—during the prepreliminary hearing.

"I don't really know because I was not there.  I'd like to find some information out of why I wasn't notified, why he wasn't given any warnings from either the Court or the attorney that was standing in.  After he made the first statement.  The first statement enough should have indicated to everybody that he wants to talk here.

"And so for me to adequately and properly prepare my opposition to [the prosecutor's] motion to include this statement, I need to know exactly what happened and I don't have that on the record.

"THE COURT:  [Prosecutor]?

7.

"[PROSECUTOR]: Your Honor, we, I assume, are not arguing the merits at this point. We are just talking about the [Evidence Code section] 402[ hearing].

"THE COURT: Correct.

"[PROSECUTOR]: I'm not sure what the [Evidence Code section] 402 [hearing] is going to solve. What happened that day on the record is a common practice here in Kern County to have a multiple-defendant case where one of the attorneys has to be in another courtroom and one of the co-defendant's attorneys stands in for other people. In this case, they were just picking dates. All the defendants objected to continuing the prelim[inary hearing], everyone made that clear, and they [were] picking dates, and I just don't see anything on the transcript that indicates something unusual that we don't all know about. And it just looks like a standard prepreliminary on a codefendant case.

"I don't understand what exactly Mr. Kinnison or [the judge] or madam reporter would say that would offer any new information or shed any light on circumstances. And I'm not trying to prevent Mr. Raimondo from getting a full understanding of the facts for him to argue his motion. I just don't see how calling these people into Court is going to change anything. I think it is something that we can argue on the merits this morning before the panel comes over. [¶] … [¶]

"THE COURT: Well, I guess my question, Mr. Raimondo, is this: Do you feel that Mr. Kinnison's inability to keep [defendant] from making spontaneous statement[s] [was] somehow [ineffective assistance of counsel?]

"MR. RAIMONDO: I think the record being blank of any attempt from stopping it from happening was a conflict of interest when it occurred because he represents a codefendant. The rumors were going around before it was actually said on the record. That is my understanding of what was going on there. There [were] different things that [were] being said. And so I think he was conveniently silent.

"I think the [Evidence Code section] 352 issues with respect to this in front of the jury is really the crux of the problem. I think I have to explain to them the prepreliminary process what goes on there, how they are forced to sit next to other codefendants, the pressure that was being placed on [defendant], the fact that his attorney wasn't there—I was his attorney—may create a conflict for me for maybe not advising him correctly before I left. There is a lot of issues that the purpose of the

8.

prelim[inary] hearing holds to negotiate your case, maybe reach a resolution. What is said down there generally stays down there. That has been the policy over the 16 years. I've never seen anything used against somebody during the course of negotiations good or bad. I would like to [get] a clear account of the facts, whether it is my deposition between [the prosecutor] and myself and probably recover everything I get from the [judge] through a stipulation, and I want to have some record that I wasn't just absent that day. I was there in the morning; we had an agreement, and then I left. And I was available. So—and also I want to question Mr. Kinnison on the apparent conflict and that may all come in during trial.

"THE COURT: Well, Mr. Raimondo, I certainly don't see any ineffective assistance by you because you were not there. I don't see how that could possibly be an issue under *Strickland*[ *v. Washington* (1984) 466 U.S. 668].

"MR. RAIMONDO: I agree.

"THE COURT: The fact that Mr. Kinnison stood in for you and was doing—essentially just picking dates. My review of the transcript is that the defendant … agreed to have Mr. Kinnison stand in for you. And then [defendant] said can I address the Court. [The judge] then said maybe, and [defendant] said on one issue, and [the judge] said go ahead.

"And essentially [defendant] said the codefendants are innocent. [The judge] says Okay. Thank you. He then goes ahead with the rest of the hearing.

"[Defendant], he didn't say at that time he accepted responsibility for the crime, only that the codefendants didn't have anything to do with it. So there is no prejudice to him at that point as to [defendant].

"They continue going along and [defendant] refuses to waive time, so he's alert, he's awake, he understands what is going on. He doesn't want to waive time. He's agreed to have Kinnison there. The Court gives new dates, vacates the other dates and essentially ends the hearing and says thank you to the parties.

"Defendant then[,] … unsolicited by any question put to him by a bench officer or an attorney[,] says he's the shooter and wants to take responsibility for the case.

"I'm not sure what Mr. Kinnison could have done to stop the defendant from making statements in open court and nor what the Judge

9.

could have done for that matter. [Defendant] implicates himself, spontaneously at the conclusion of the hearing. Mr. Raimondo [has] given no authority to the defendant spontaneously making unsolicited statements in open court that implicate him somehow arises to the level of [ineffective assistance of counsel]. I'm going to deny your request.

"MR. RAIMONDO: Thank you." (Italics added.)

### 3. Prosecution Trial Testimony

At trial, Deputy District Attorney Antonios testified that typically, the pre-preliminary hearing is the first opportunity that the attorneys have to negotiate a case. Either the negotiations resolve the case, or the case gets continued. However, in defendant's case, the purpose of the pre-preliminary hearing on September 9, 2016, was to set new dates. She explained, "One of the attorneys needed a continuance on that date; so we decided on new dates." When they went into court to set the new dates on the record, she saw defendant and heard him make two statements in open court. She explained this in the following testimony:

"[PROSECUTOR:] When you were out setting dates on the record, did you hear anything that [defendant] said?

"[ANTONIOS:] Yes. Initially we were setting the continuance, setting the new dates, and initially at some point [defendant] interrupted the judge a little bit, asked if he could say something. I remember the judge being a little hesitant, but he let him talk.

"[Defendant] initially said, 'They are innocent.' He was referring to his co-defendants at the time. He—[¶] … [¶]

"[PROSECUTOR:] What, specifically, did [defendant] say?

"[ANTONIOS:] He did say they are innocent, but he also named who they are. He said Mr. Morris, Mr. Hartfield, and Miss Taylor.

"[PROSECUTOR:] At the conclusion of putting the dates on the record, did you hear [defendant] say anything else?

"[ANTONIOS:] Yes. So that was his first—the first time he sort of interrupted the judge and spoke on the record. Then after one of the defense attorneys made a record, we finished picking new dates, then sort

10.

of at the end of that proceeding, [defendant] again spoke up, and he said he was just trying to take responsibility and he was the shooter."

On cross-examination, Antonios testified that defendant's counsel was not present to represent defendant at the pre-preliminary hearing and that codefendant Taylor's counsel, Kinnison, was standing in for him. Antonios said she had previously heard judges tell defendants to speak to their lawyer when the defendant wanted to speak in court. In this case, however, the judge did not tell defendant to speak to his lawyer. Antonios could not say whether Kinnison did anything to stop defendant from speaking, but she did not hear anything. She said, "I didn't see if [Kinnison] tried to quiet [defendant] or anything, but I didn't hear anything that [Kinnison] said."

Hartfield testified he heard defendant say at the hearing, "These people are innocent and they didn't have nothing to do with it. I'm the shooter. I'm the one you want."

### 4. Defense Trial Testimony

Kinnison, the sole defense witness, testified that it was "very common" for attorneys to stand in for one another in "straightforward" matters. He further testified as follows:

> "[RAIMONDO:] … [¶] And had you seen the situations where defendants want to start talking to the judge?
>
> "[KINNISON:] Yes…. [¶] … [¶]
>
> "[RAIMONDO:] Okay. So tell us the normal practice that you observed.
>
> "[KINNISON:] Well, it would not be unusual for a defendant to want to say something about their case, and typically an attorney doesn't want that to happen ….
>
> "[RAIMONDO:] Now, in this particular matter, I know you haven't reviewed the transcript, but what's your memory what went on there that morning after I had left to be upstairs?

11.

"[KINNISON:] Yeah. [Defendant] wanted to talk to judge, and judge allowed it, and then it was a pretty quick statement, as I recall, and judge didn't shut it down like he normally would, which, obviously, took me by surprise.

"[RAIMONDO:] Now, you've got Miss Taylor, she's a female, and then [defendant], obviously a male. Are they—do they sit like our jury, boy, girl, boy, girl, or they keep them separate?

"[KINNISON:] Well, my client [Taylor] was out of custody. [¶] … [¶]

"[RAIMONDO:] But on that day, when you were with her, were you also—was it hard to be with both at the same time?

"[KINNISON:] Right.

"[RAIMONDO:] And did you make any attempt to stop [defendant]?

"[KINNISON:] Well, in retrospect, I should have, but like you say, my recollection, it was a pretty quick statement, and then what was said was said."

## B.     The Law

Under the Sixth Amendment to the United States Constitution and article I, section 15 to the California Constitution, a criminal defendant has the right to effective assistance of counsel. (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).) Effective assistance of counsel "includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client." (*Ibid*.) Both state and federal conflict of interest claims are analyzed under the federal standard articulated in *Strickland v. Washington* (1984) 466 U.S. 668, which "generally require[s] a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different." (*Doolin*, at p. 417.)

"In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of

12.

interest '*that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.' " (*Doolin*, *supra*, 45 Cal.4th at p. 417.) Determining whether counsel's performance was adversely affected " 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are … bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' " (*Id.* at p. 418.)

As to the second prong, "the high court has recognized a presumption of prejudice applies when defense counsel 'actively represented conflicting interests.' " (*Doolin*, *supra*, 45 Cal.4th at p. 418.) Such "conflicts may arise in circumstances in which one attorney represents more than one defendant in the same proceeding." (*People v. Bonin* (1989) 47 Cal.3d 808, 835.) However, reversal is automatic in those cases only "where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." (*Mickens v. Taylor* (2002) 535 U.S. 162, 168.) Otherwise, reversal is required only upon a showing that a conflict of interest adversely affected counsel's performance. (*Doolin*, at p. 418.)

Moreover, the right to conflict-free counsel may be waived. (*People v. Bonin*, *supra*, 47 Cal.3d at p. 837.) "To be valid, however, 'waivers of constitutional rights must, of course, be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences[,]" … [and] must be unambiguous and "without strings." ' " (*Ibid*.) "Before [the trial court] accepts a waiver offered by a defendant, the trial court need not undertake any 'particular form of inquiry …, but, at a minimum, … must assure itself … (1) [that] the defendant has discussed the potential

13.

drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right.' " (*Ibid.*)  The court may not rely on counsel to assure that each of the joint clients has made an effective waiver, but must make the determination itself.  (*People v. Mroczko* (1983) 35 Cal.3d 86, 112, disapproved on other grounds in *Doolin*, *supra*, 45 Cal.4th at p. 421 & fn. 22.)

### C.     Analysis

In this case, it does not appear that Kinnison had an actual conflict of interest because Taylor and defendant did not have adverse interests for the purpose of this particular pre-preliminary hearing.  According to Deputy District Attorney Antonios, the purpose of this hearing was merely to set new pre-preliminary and preliminary hearing dates.  Thus, Taylor and defendant had identical positions at the hearing—neither wanted to waive time.  But even if an actual conflict of interest did exist, defendant has not shown that Kinnison performed deficiently.

As noted above, in assessing Kinnison's performance, we must consider "whether [he] failed to represent defendant as vigorously as he might have, had there been no conflict." (*Doolin*, *supra*, 45 Cal.4th at p. 418.)  As to the defendant's first statement, the record shows that defendant asked the judge if he could address the court and the judge allowed him to speak.  As to defendant's second statement, the record reflects defendant made the statement spontaneously at the end of the hearing.  Although Kinnison agreed he should have advised defendant, after his first statement, not to speak any further, Kinnison's failure to prevent defendant's unsolicited and spontaneous statement does not amount to deficient performance—"[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a

14.

reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." (*Harrington v. Richter* (2011) 562 U.S. 86, 110.)

In terms of prejudice, a presumption of prejudice is not applicable to the conflict asserted here because Kinnison was not forced to represent both Taylor and defendant over Kinnison's timely objection. (See *Mickens v. Taylor*, *supra*, 535 U.S. at p. 168 [reversal is automatic only in cases "where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict"].) Most significantly, even if an actual conflict of interest did exist and Kinnison did perform deficiently, defendant was not prejudiced by the admission of his pre-preliminary hearing statements because, even without those statements, there was overwhelming evidence of his guilt. Hartfield testified that he saw defendant shoot Lacey twice with a black revolver. Taylor told police on the day of the shooting that defendant was the shooter. Although she did not see the shooting occur because she put her head down, she said defendant was the only person in the room with a gun. According to Taylor, defendant walked in with a black revolver in his hand and when the shooting occurred, she heard two shots. Morris also testified he heard two gunshots and defendant was the shooter. Additionally, Hinzo testified that after the shooting, defendant asked her to get rid of a black revolver. She later led a police officer to the location of the gun, where a black revolver containing two spent rounds was recovered. Thus, there is no reasonable probability that the result of the proceedings would have been different even if Kinnison had made an attempt to prevent defendant from speaking at the pre-preliminary hearing.

Alternatively, defendant argues he was prejudiced because the court denied his request for an Evidence Code section 402 hearing. For the same reason—overwhelming evidence of defendant's guilt—we conclude defendant was not prejudiced by the court's denial of an Evidence Code section 402 hearing.

15.

## II.     Evidence Code Section 352

Defendant next contends the trial court abused its discretion by admitting his pre-preliminary hearing statements pursuant to Evidence Code section 352.  We disagree.

A court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

A trial court's ruling under Evidence Code section 352 is reviewed for abuse of discretion and will " 'not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  Moreover, improper admission of evidence under Evidence Code section 352 is harmless where there is overwhelming evidence of a defendant's guilt. (*People v. Doolin, supra*, 45 Cal.4th at p. 439.)

Thus, even if we assume evidentiary error, we conclude any error was harmless in light of the overwhelming evidence of defendant's guilt apart from his pre-preliminary hearing statements.

## III.    Senate Bill No. 620

Defendant further contends his case should be remanded to allow the trial court to exercise its newly granted discretion to strike his firearm enhancements.  The People concede, and we agree.

Senate Bill No. 620 (2017–2018 Reg. Sess.) amended section 12022.53 to provide the trial court with discretion to strike or dismiss a firearm enhancement in the interest of justice.  (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018.)  The new law applies retroactively to parties, like defendant, whose judgements were not yet final on the statute's operative date.  (See *People v. Johnson* (2019) 32 Cal.App.5th 938, 942 [" ' "[F]or the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed" ' "].)  " 'A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.'  [Citation.]  In such circumstances, … the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' "  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

The record before us reflects that the trial court did not know it had discretion to strike defendant's firearm enhancements, and there is no clear indication the court would not have struck the enhancements if it had discretion to do so.  At sentencing, the trial court noted that it had "very little discretion" with regard to the sentence that it could impose for the firearm enhancements once the jury found the enhancements true.  It further noted, "Even if I gave him low term on the other counts, he's still looking at a life crime.  [¶]  It's, unfortunately, the way that the law is written.  Not a whole lot I can do

about that now." Accordingly, the trial court should be provided the opportunity to exercise its discretion to strike the firearm enhancements on remand.

## IV. Senate Bill No. 136

By way of supplemental briefing, defendant also contends his prior prison term enhancements must be stricken in light of Senate Bill No. 136. Again, the People concede, and we agree.

Senate Bill No. 136 (2019−2020 Reg. Sess.) amended section 667.5, subdivision (b) to limit prior prison term enhancements to only prior terms that were served for a sexually violent offense as defined by Welfare and Institutions Code section 6600, subdivision (b). (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020.) Defendant's four prior prison terms were not served for sexually violent offenses, and thus they must be stricken.

### DISPOSITION

The matter is remanded to the trial court to allow the court to exercise its discretion whether to strike or impose defendant's two firearm enhancements pursuant to section 12022.53, subdivision (h). The court is instructed to strike the four prior prison term enhancements pursuant to section 667.5, subdivision (b). The court is directed to prepare an amended abstract of judgment and forward it to the appropriate entities. In all other respects, the judgment is affirmed.

HILL, P.J.

WE CONCUR:


FRANSON, J.


PEÑA, J.

18.